# Supreme Court of Florida

————————

No. SC11-1122

————————

**LEON DAVIS, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[November 10, 2016]

PER CURIAM.

This case is before the Court on appeal from two judgments of conviction of first-degree murder and two sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Leon Davis, Jr. (Davis), was convicted in Polk County of the murders of Yvonne Bustamante and Juanita Luciano. Davis now pursues the direct appeal of his convictions and sentences which are subject to automatic review by this Court. For the reasons explained below, we affirm the trial court's judgments of conviction and sentences of death. We first set forth the facts of this case and we then address Davis's claims on direct appeal. We conclude by evaluating the sufficiency of the evidence used to convict Davis, the proportionality of Davis's

death sentences, and Davis's assertion that he is entitled to relief under <u>Hurst v. Florida</u>, 136 S. Ct. 616 (2016) (<u>Hurst v. Florida</u>).

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### The Events at Headley Insurance

The evidence introduced at Davis's trial revealed the following. Around 3 p.m. on December 13, 2007, Davis entered the Lake Wales location of the Headley Insurance Agency (Headley) with the intent to commit robbery. Davis was armed with a loaded .357 magnum revolver and equipped with duct tape, a cigarette lighter, gloves, a gasoline can that contained gasoline, and a lunch cooler to conceal the revolver.

That afternoon, two Headley employees, Yvonne Bustamante (Bustamante) and Juanita Luciano (Luciano), were working. Bustamante, a licensed customer service representative, had worked at Headley for nine years. Luciano, a customer service representative, had worked at Headley for about three years. At the time, Luciano was twenty-four weeks pregnant. Upon entering the business, Davis locked the front door to prevent other customers from entering. He also placed duct tape over the lens of a security camera. Davis demanded money from the women, who initially refused to comply.

Davis then forced the women to open the company's safe and cash box, which contained a combined amount of about $900. During the course of the

robbery, Davis bound the women with duct tape, poured gasoline on them, and set them on fire. At 3:35 p.m., one of the women activated the office's panic alarm, which sent a signal to the alarm company. The Lake Wales Police Department was contacted one minute later.

### Victims Seek Help; Davis Shoots Bystander

Bustamante and Luciano escaped the burning building and ran in separate directions seeking help. Bustamante eventually ran to the parking lot of the Headley building, and Luciano ran to a nearby restaurant, Havana Nights. As Bustamante tried to escape, Davis shot her in her left hand.

By this time, concerned people who lived nearby had noticed the presence of smoke and walked to the area to investigate. These people, Fran Murray, Brandon Greisman, and Carlos Ortiz, were on the scene before emergency personnel arrived and became eyewitnesses to the aftermath of the robbery. Another eyewitness, Evelyn Anderson, was a Headley customer who arrived at Headley while the robbery was in progress. At trial, these eyewitnesses testified about the events at Headley, including their various encounters with Davis.

Fran Murray (formerly Fran Branch) testified that at the time of the robbery, she was sitting outside of her apartment and saw smoke nearby. She walked toward the smoke to investigate its source. Around the same time, her neighbors,

including Greisman and Ortiz, also noticed the smoke. They all proceeded to walk toward the smoke to investigate.

As Murray approached the smoke, she realized that it was coming from the Headley building. She then saw Bustamante, who was yelling for help and whose body was burning. Murray observed that Bustamante was wriggling her wrists to free them of a thick gray tape, and that Bustamante's "skin was falling off of her." "And, just, she wasn't screaming, but she wasn't talking lightly either. She was just trying to get away."

As Greisman approached the building, he saw a woman whose body was burning, and he went to help her. At the same time, Greisman saw Davis walking towards them, and he originally thought that Davis was coming to help the distressed woman. Greisman made eye contact with Davis, who pulled a gun out of the cooler that he was carrying and pointed it at Greisman. Greisman tried to get away, but Davis shot him in the face, hitting him in the nose. The gunshot caused profuse bleeding and removed the tip of Greisman's nose.

Murray, who was still in the vicinity, heard popping sounds and saw Greisman fall to the ground and catch himself with his hands. She saw Davis walk away and place a gun into his lunch cooler. Murray then assisted Greisman, who was getting up from the ground.

Carlos Ortiz also heard the popping sounds as he approached the Headley building. As he got closer to the building, Greisman was walking back toward him with a bloody face. Greisman told Ortiz that he had been shot, and Ortiz saw Davis behind Greisman. Ortiz saw a part of the gun that Davis was carrying, and he saw Davis stick his hand into the lunch cooler. Ortiz made eye contact with Davis while trying to help Greisman as well as make sure that Davis was not following them. Greisman walked back to his home, and Ortiz and Murray assisted him while awaiting the arrival of emergency help.

Evelyn Anderson, a Headley customer, arrived at Headley to pay her insurance bill during the time that the robbery was taking place. Anderson parked her sport utility vehicle in front of Headley, and her teenage granddaughter and infant grandson remained inside the vehicle. When Anderson tried to open the front door of the Headley building, she discovered that it was locked. Anderson walked to the side of the building to try and determine why she was unable to enter the building during normal business hours. While walking, she noticed that smoke was coming out of the building. Anderson also heard popping sounds, and shortly thereafter, Davis walked out of the building and placed the cooler under his arm. Anderson asked Davis what was happening. Davis continued walking away but responded that there was a fire in the building. Davis then walked to his vehicle, a

black Nissan Altima, that was parked at a vacant house nearby.  Davis got inside of the vehicle and drove away.[1]

Shortly thereafter, Anderson came into contact with Bustamante.  Anderson received a minor burn on her hand when she touched Bustamante, who was screaming for help and was severely burned.  Bustamante walked towards Anderson's vehicle, and Anderson's granddaughter, who was seated in the front seat of the vehicle, ran away from the vehicle after seeing Bustamante's burning body.  Bustamante walked to the open vehicle door and climbed inside the vehicle.  Anderson encouraged Bustamante to get out of the vehicle because the paramedics were on the way.  Bustamante got out of the vehicle and leaned on the hood.

By this time, Murray had finished attending to Greisman, and she returned to Headley to see if she could provide further help.  Murray saw Bustamante leaning against Anderson's SUV.  Murray described the scene as follows:

> She [Bustamante] was um, screaming she was hot.  And that her skin was rolling off of her body at this time.  It was disgusting.  You could smell the burnt skin and flesh.  And she was screaming she was really, really hot and she was thirsty.  And so I ran across the street at that time to Havana Nights, which was a restaurant, a Cuban

---

1. Earlier that afternoon, Murray saw a black car sitting on a back street near a vacant house.  After the robbery, she noticed that the car was not there.  Additionally, Ortiz saw Davis walk away from the scene and towards the back of the vacant house.  Ortiz also noticed a black Nissan that he had not seen parked in that location before.  Ortiz saw the Nissan being driven away, but he did not see the driver.

restaurant, across the street of Headley, off of the other corner of Phillips, and got a cup of ice water in a to go cup.

Murray returned to Bustamante with the cup of water, and Bustamante sipped from the cup while awaiting the arrival of emergency personnel. Murray talked with Bustamante, and Murray described their conversation as follows:

> I introduced myself as Fran and she introduced herself as Yvonne. We sat there talking a minute and she started to say—and I gave her water. And, um, she said that she didn't understand how anybody would rob her, she didn't have any money. And that her kids, please pray, I'm not going to make this Fran. And I told her that I would get to the hospital if I could to see her, if it was allowed and that I would keep her in my prayers, that with God everything was possible. She wanted to talk about her children. And I cannot remember clearly if I asked her who did it, or if she was just talking. And she said that it was a black gentleman, and that he should be on video tape. She then started crying again and said she loved her babies very much, and she doesn't understand how anybody could do this to her.

Bustamante also told Murray that she had been bound with tape, doused with gasoline, pushed into a bathroom, and set on fire.

In the meantime, Luciano escaped the Headley building and ran to the nearby Havana Nights restaurant. The restaurant's owner, Jaidy Jiminez, heard a loud boom, and shortly thereafter, Luciano ran into the restaurant. Although Luciano was a Havana Nights customer, she was so badly burned that Jiminez did not recognize her: "I saw a woman that was naked, burned, um, burned from head to toe, no shoes on, or any clothes on, just underwear. But I couldn't recognize her."

Luciano asked for help and begged Jiminez to close the door because "he" was coming. Jiminez helped Luciano, whom she realized was pregnant, sit down. Additionally, other people inside the restaurant were trying to call 9-1-1 and to assist Luciano. Luciano asked what was taking so long for help to arrive and stated that she could not feel her baby moving. Jiminez tried to reassure her. It was during this time that Murray came into the restaurant asking for water, and Jiminez provided it to her. Jiminez walked outside the restaurant to get help, and she saw the severely burned Bustamante. Once the paramedics arrived and began to assist Bustamante, Jiminez told them that another injured woman, Luciano, was inside of the restaurant.

**Emergency Personnel Response**

Emergency dispatches increased in their sense of urgency as the initial report of a fire gave way to additional reports of injuries and a shooting. Lt. Joe Elrod of the Lake Wales Police Department first encountered Greisman, who explained that he was shot while attempting to help a woman whom he heard screaming for help and soon discovered was on fire.

Lt. Elrod determined that Greisman's injuries were not life-threatening, and because emergency medical personnel were on the way to assist Greisman, he proceeded to the Headley building. When Lt. Elrod arrived at Headley, emergency medical personnel were already on the scene and were assisting Bustamante in the

parking lot. Lt. Elrod observed Bustamante's severe burns, and he estimated that the burns covered about eighty percent of her body. Lt. Elrod immediately understood the gravity of Bustamante's injuries, and he decided not to wait until later to obtain Bustamante's statement. Lt. Elrod testified: "I knew she was going to die, so I tried to get information from her on who did it to her." "I asked her who did it to her. And she told me it was Leon Davis. And then I asked her, how she knew him. And she said that she knows him and that he was [a] prior client of theirs in the Insurance Company." Bustamante explained that Davis tried to rob them, and when they did not give him money, he threw gasoline on them and set them on fire. When they tried to run, Davis continued to throw gasoline on them.

Lt. Elrod then located Luciano inside of the Havana Nights restaurant. When he walked inside the restaurant, he saw Luciano, who was "obviously pregnant," sitting down. Lt. Elrod characterized Luciano's burn injuries as even worse than Bustamante's. Lt. Elrod went outside and told emergency personnel that another victim needed help who was in even worse condition than Bustamante. He then began dispatching the name "Leon Davis" to law enforcement and conducting routine duties at the crime scene.

Paramedic John "Chip" Johnson and emergency medical technician Ernest Froehlich were the first emergency medical personnel to arrive on the scene. Upon arrival, they first saw Bustamante, who was in the parking lot and leaning on

Anderson's SUV. Johnson observed: "the skin, everywhere I could see it, it was peeling back, and she had suffered major burns. Also she had darkened hands, and a further injury to her left hand, [t]hat was my observations at that time." Froehlich testified that Bustamante "looked like she had burns all over her body, hair singed off, most of her clothing was burned off, skin was hanging off her back and buttocks."

Froehlich was present when Lt. Elrod asked Bustamante if she knew who the perpetrator was, and he overheard Bustamante say "Leon Davis." Johnson also heard Bustamante state that Davis was the perpetrator, although he was unable to clearly hear Bustamante say Davis's first name. Anderson also heard Bustamante identify Davis as the perpetrator.

After initially assisting Bustamante, Johnson went to Havana Nights to assist Luciano. When Johnson entered the restaurant, he noticed water on the floor and saw Luciano, who was severely burned and "basically naked." There was a plastic substance on her wrists, neck area, and feet. Luciano, who was conscious, breathing, and able to talk clearly, told Johnson that she was pregnant and that while working in her office, someone poured gasoline on her and set her on fire. Luciano also told Johnson that her wrists were burning, and Johnson went to the ambulance to get sterile water to alleviate her pain.

By this time, additional emergency medical personnel were dispatched to the scene. Upon arrival, paramedic George Bailey assumed primary responsibility for Luciano's care, and Johnson went back to the parking lot to continue assisting Bustamante. Luciano was conscious and able to respond to questions. She explained to Bailey "that there had been a robbery, at the business where she was at, she had been tied up or bound with tape, and had gasoline poured on her and had been lit on fire." Bailey did not ask her who harmed her, but Luciano told him that the person was a man and that she knew who it was. Luciano also told Bailey that she was twenty-four weeks pregnant. Bailey estimated that eighty percent of Luciano's body was burned with second- and third-degree burns.

Both Bustamante and Luciano were airlifted to the Orlando Regional Medical Center for treatment in the burn unit. Luciano underwent an emergency caesarean section, during which she gave birth to her son, Michael Bustamante, Jr.[2] Although detectives went to the hospital in hopes of interviewing Bustamante and Luciano, the severity of their injuries prevented the detectives from ever meeting with them.

---

2. Yvonne Bustamante's brother, Michael Bustamante, was in a relationship with Luciano and was the father of baby Michael.

- 11 -

Michael lived for three days after his emergency delivery. He died as the result of extreme prematurity. Bustamante lived for five days, and Luciano lived for three weeks. Autopsies of both women revealed that they died from complications of thermal burns due to the fire. According to the medical examiner, Bustamante suffered burns that covered eighty to ninety percent of her body. Luciano suffered burns that covered about ninety percent of her body. Additionally, the autopsy of Bustamante revealed bullet fragments from the gunshot to her left hand, although the gunshot was not a cause of her death.

**Events after the Robbery**

After leaving the scene, Davis went to a branch of the Mid Florida Credit Union, where he was an established customer. At 4:19 p.m., less than forty-five minutes after the alarm was activated at Headley, Davis walked into the credit union to make a cash deposit. Jessica Lacy, the teller who assisted Davis, was familiar with him as a customer and knew Davis by name. Davis deposited $148 in cash into his account that previously had a balance of $5.33. While processing Davis's transaction, Lacy observed that Davis's face was bloody and appeared to have scratches and marks on the nose, lip, and chin. The credit union branch manager, Valerie Dollison, was also working that afternoon. She did not personally know Davis, but she heard someone call him "Leon."

Davis also went to the house where his brother, Garrion Davis (Garrion), and Garrion's girlfriend, Melissa Sellers, resided.[3] Garrion testified that on the afternoon of December 13, "my brother came to my house. He wanted to—he needed some soap to wash his face. And he went outside my house and washed his face. I noticed he had a scratch on his face. He told me he had robbed somebody." Garrion testified that Davis also came inside the house and took a shower. Garrion estimated that Davis was at the house for ten to fifteen minutes.

Sellers, who was at home with Garrion at the time, testified about Davis's visit to their house that afternoon. Sellers wished Davis, whose birthday was the next day, a happy early birthday. She estimated that Davis was at her house for ten minutes or less, and although she was not certain whether he had taken a shower, she knew that he had been in their bathroom. When Davis left, Sellers observed that Garrion's demeanor had changed. Garrion seemed upset and was teary-eyed.

Later, Davis went to a friend's home, where he used the cell phone of a woman named Fonda Roberts. Roberts was unable to hear Davis's conversation, which lasted a couple of minutes. When Davis was finished using the phone, he started to hand the phone to Roberts and then pulled it back from her. Davis then

---

3. By the time of trial, Sellers and Garrion were married.

erased the number that he called. Roberts observed that at the time, Davis was driving a black vehicle.

## Davis Turns Himself In

As the afternoon progressed, a massive investigation began. Davis's photograph was shown on television as media began to report the events at Headley, and Davis's family and friends became increasingly aware of Davis's status as a suspect in the day's events. Davis's family and friends frantically began trying to locate him in hopes that they could convince him to turn himself in safely.

That evening, Davis called his sister, Noniece DeCosey, and asked her to come and pick him up near a McDonald's. Their mother, Linda Davis, accompanied DeCosey to meet Davis. DeCosey drove them to a Circle K convenience store to meet Davis's and DeCosey's other sister, India Owens, and family friend Barry Gaston. Upon arrival, Davis walked up to Gaston, hugged him, and said: "I hurt someone." When Gaston asked Davis what he did, Davis said that he did not know. Davis and his mother got into a car with Owens and Gaston.

Gaston, a former law enforcement officer, helped facilitate Davis turning himself in at the Polk County Sheriff's substation. Gaston testified that on the way to the substation, Davis laid his head on his mother's lap in the backseat of the car and cried and sobbed. Davis again said that he hurt somebody, but Gaston told

him not to say anything more. Davis was turned over to the Polk County Sheriff's Office without incident. Davis was later transported from the Sheriff's Office substation to the Bartow Air Base for further processing.

A number of people with whom Davis came into contact later in the day testified at trial that Davis appeared to have some sort of injury to his nose. The crime scene technician who photographed Davis after he was taken into custody and a law enforcement officer who interacted with Davis upon his transfer to the Bartow Air Base both testified that Davis appeared to have either scratches or a burn on his nose. Additionally, Davis's sister, Noniece DeCosey, saw a red mark on Davis's nose that could have been a burn.

That night, a black Nissan Altima was found at the Lagoon nightclub in Winter Haven. Law enforcement officers were dispatched to the location, and the car was seized pending a warrant to search the car's interior. Searches conducted in the vicinity of where the car was located, in particular to look for a firearm, did not reveal any additional evidence. The following day, after the search warrant was signed, law enforcement conducted an interior search of the Altima. Davis's driver license was found inside the car.

Davis was later tried for three counts of first-degree murder (Bustamante, Luciano, and baby Michael), one count of attempted first-degree murder (Greisman), one count of armed robbery, and one count of first-degree arson.

**The Guilt Phase**

The State's theory at trial was that Davis, a man driven by mounting financial pressures, planned the robbery of Headley, a business with which he was familiar. Davis's business relationship with Headley dated back to 2004, and as reflected in various records, Davis's insurance needs were primarily handled by Bustamante. The State introduced evidence that established a timeline of events leading up to the robbery, including Davis's actions on the day of the robbery. A summary of this evidence follows.

In the months leading up to the robbery, Davis experienced increasing financial difficulty. Davis, who at the time was married to his wife Victoria, was primarily responsible for the family obligations, including the mortgage payment on their home. At the time, Davis and his wife had two cars: a blue Nissan Maxima owned by Davis, and a black Nissan Altima owned by Victoria. Both vehicles were insured under policies written by Headley. In June 2007, during a visit to the Mid Florida Credit Union, Davis became aware that the amount of the automatic debit from his account for his insurance coverage had been increasing over time. Davis was also informed that his account was overdrawn and became irate.

Unable to afford insurance for both cars, Davis and Victoria removed the license plate from the Maxima, canceled the car's insurance policy, and relied

solely on the Altima for transportation. The couple was also unable to afford cell phone service during this time. Victoria had been working, but she became pregnant and was forced to stop working because of pregnancy complications.

### Davis's Plan to Rob Headley

Davis's plan to rob Headley began to coalesce in early December. By this time, the couple had reached the limits on their credit cards, and the mortgage payment was delinquent. One week before the robbery, Headley customer Virginia Vazquez saw Davis at Headley. She first saw Davis in the parking lot looking in the back of a black car. Then, Davis went inside and began talking with Bustamante. Vazquez and her husband waited inside the insurance agency for fifteen to twenty minutes before Bustamante finished talking with Davis. Vazquez later recognized Davis from news coverage as the person she saw during her visit to Headley.

Davis's preparation for the robbery also involved acquiring various items that he would need in order to carry out the robbery, including a gun and ammunition. On December 7, 2007, six days before the robbery, Davis went to visit his cousin, Randy Black. Davis told Black that he needed a gun for personal protection because he was going to travel to Miami. Black owned two guns, including a recently purchased Dan Wesson .357 magnum revolver. Black showed Davis both guns, and Davis opted to purchase the .357 magnum for around $200.

Black also gave Davis .38 caliber bullets which were compatible with the .357 magnum. Davis and Black fired the revolver, which was operating normally. Later, Davis showed his mother the revolver. Davis told her that he got the revolver from Black and that he and Black fired it.[4]

### Davis's Actions on the Day of the Robbery

The evidence introduced at trial also established a detailed timeline of Davis's actions on the day of the robbery, which included a visit to Walmart to purchase supplies that he would use later that day. On the morning of December 13, Victoria Davis last saw her husband at about 6 a.m. Before 7 a.m., Davis took his son, who had spent the previous night with Davis and Victoria, home to the boy's mother, Dawn Henry. His son's birthday was that day.

Davis then went to the Lake Wales Walmart, where surveillance video and still photographs showed him making three separate purchases around 7 a.m. The first purchase included a cap, long-sleeved shirt, and soft, orange lunch cooler. Davis's second purchase was a pair of gloves, and the third purchase was a Bic cigarette lighter. All of the purchases were cash transactions.

---

4. After Black realized that law enforcement was looking for Davis, he immediately contacted law enforcement to advise that he recently sold Davis a gun. Black also provided law enforcement with two .38 caliber bullets and the receipt documenting his original purchase of the gun.

While at Walmart, Davis spoke with the store manager, Mark Gammons, and a store employee, Jennifer DeBarros. Gammons testified that Davis approached him and asked where gloves were located in the store. When Gammons saw Davis's picture on the news that evening, he realized that he had seen Davis in Walmart that morning. Walmart employee Jennifer DeBarros had known Davis for more than ten years and was a family friend. DeBarros testified that on the morning of December 13, she talked with Davis during his visit to Walmart. DeBarros talked with Davis about his son's birthday.

Some time after leaving Walmart, Davis drove to the home of his sister, India Owens. Davis then accompanied Owens to take her car for repairs and pick up a rental car. They later went to pick up some furniture, and they stopped at a restaurant for lunch. Davis seemed agitated while eating lunch.

Video surveillance showed that Davis left the restaurant at 1:38 p.m. Davis and Owens then delivered the furniture to Owens's house. During that time, Owens noticed that Davis began acting strangely, obsessively locking doors in the house. Davis also asked for a piece of duct tape but did not say why he needed it. A short time later, Davis left Owens's house. Although Davis's son had a birthday party at school that afternoon, Davis did not attend. Davis entered the Headley building sometime around 3 p.m.

## The Investigation

In addition to evidence surrounding the events at Headley, their aftermath, and Davis's behavior leading up to and including the day of the robbery, the State introduced evidence regarding various aspects of the investigation.

The expansive crime scene investigation spanned several days, and the numerous crime scene photographs entered into evidence depicted a gruesome series of events that began inside the Headley building and continued outside. The exterior photographs depict the entrance to Headley, the parking lot, Anderson's vehicle, and the trail of bloody footprints and burnt skin that led from the Headley building to Havana Nights. Anderson's SUV was smeared with blood on both sides of the hood and was marked by blood stains on the vehicle doors and in the passenger side interior.

The interior photographs captured the damage in various areas of the Headley building, including fire damage in the office area, the storage area, and the extensively damaged bathroom. Among the widespread fire damage to and debris in the Headley building, the interior crime scene photographs revealed the presence of blood, a severely burnt chair, two cigarette lighters (one of which was identified as a Bic lighter), burnt duct tape, a burnt plastic gasoline can, an open cash box that contained only coins, an open and empty safe, a bloody alarm key pad, and burnt

surveillance equipment. The photographs also showed bullet holes in a wall, a door, and an exterior shed door. A bullet was retrieved from the shed floor.

Detective Jeff Batz, an arson investigator, detected the odor of gasoline inside the Headley building, and noted that it was particularly strong near the rear of the building. Batz identified three areas of fire origin inside the Headley building: a chair located near the front door, the storage room, and the bathroom. Batz testified as follows: "Three-points of origin, separate in nature[,] neither one of them had connections with each other, directly through flame impingement. They all started with an open flame type device and accelerant was used on all three areas."

The investigation also included an examination of the seized Nissan Altima. When the car's floor mats were analyzed for the presence of an accelerant, a certified accelerant detection K-9 alerted to the presence of accelerant on the driver's floor mat and the passenger rear floor mat.

Several days after the robbery, a search warrant was executed at Davis's home. Although trial testimony revealed that Davis was responsible for the yard work at his home and that he kept a lawn mower and a gasoline can in the garage, law enforcement located only the lawn mower. No gasoline can was found at Davis's home.

The gun used in the Headley crimes was never recovered.  However, the rifling characteristics of the projectiles retrieved from the crime scene and from Bustamante's hand were determined to be consistent with the rifling characteristics of handgun manufacturer Dan Wesson, the manufacturer of the .357 magnum revolver that Davis bought several days before the robbery.

**The Verdict and the Penalty Phase**

On February 15, 2011, the jury convicted Davis of six counts: the first-degree murders of Bustamante, Luciano, and baby Michael; the attempted first-degree murder of Greisman; armed robbery; and first-degree arson.  The penalty phase began two days after the jury rendered its guilty verdicts, wherein the State sought to prove seven aggravating circumstances.  In addition to testimony from Davis's probation officer and the medical examiner, the State presented victim impact testimony from Bustamante's and Luciano's families.

Angela Bryson, the State's first witness, was Davis's felony probation officer.  Bryson testified that Davis was placed on probation for grand theft on July 6, 2007.  Davis was still on probation at the time of the Headley crimes.  Dr. Stephen Nelson, the medical examiner, returned to the stand as the State's second witness.  Dr. Nelson provided further testimony regarding the injuries sustained by Bustamante and Luciano:

> They would begin to feel pain immediately upon the fire starting to consume their skin.  The burns that are present on these victims is

approximately 80 to 90% of the body surface area. It is third and fourth degree burns. First-degree burn is a sunburn, a second-degree burn is a blistered sunburn, a third-degree would be a full thickness burn that goes through the full thickness of the skin, involves nerve endings. And fourth degree burns would largely be charred, burns where the skin is charred. So, the first-degree and second-degree burns, I think we have all had sunburns, we know how painful those are. If we have a sunburn, a second degree burn that has fluid filled vessel that pops, that's painful. The third-degree burn, again, it involves the degree of thickness that is burned through skin. And the third-degree burns are painful in that they produce the burning sensation itself, up to a point at which point the nerve endings under their skin are damaged. And then there is no more pain or nerve signal that is sent from the fire. However in addition to the burn being produced by the gasoline, whatever it is that is on their skin that's flaming, the subsequent treatment for a burn is also painful.

Dr. Nelson also testified that both women would have been capable of feeling pain in some areas even if their nerve endings were destroyed in others. Both women, who were so severely injured that an IV could not be inserted into their veins, would have experienced pain when intraosseous catheters were inserted into their leg bones to receive medication. The women would have stopped experiencing pain once they received the medication or were medically induced into a coma, but they could have been conscious of what was going on until that point.

After the State's penalty phase presentation, Davis offered evidence in mitigation and alleged the existence of two statutory mitigating circumstances and fifteen non-statutory mitigating circumstances.

Multiple witnesses testified that Davis's childhood was marked by abuse. When Davis was eight years old, he was sexually assaulted by another child. The

following year, a woman named Ms. Clark moved into the family home as a roommate. Sometime later, Davis and his brother Garrion moved out of the family home and began staying with Clark, who was an alcoholic and was physically and verbally abusive. Clark routinely beat Davis, and on one occasion, she caused severe injuries to the back of his body by beating him with an extension cord. Clark taunted Davis with physical and verbal abuse because he was bullied by other children, and she also hit him with water hoses and punched him in the chest. Family members observed physical injuries such as welts, bleeding, and open scabs and sores on Davis's body.

Additionally, Davis suffered from ongoing depressive and mood episodes, in part due to the bullying he suffered from elementary school through high school. In middle school, Davis began talking about suicide, and his mother encouraged him not to take his life. Davis received mental health counseling for two to three months, but his problems continued. After graduating from high school, Davis joined the United States Marine Corps. However, the following year, Davis was involved in a vehicle accident and he revealed that he intentionally crashed the vehicle that he was driving. Pursuant to a recommendation for an administrative separation, Davis was discharged from military service.

Although Davis was only about one year old when his father moved out of the family home, his father remained a part of Davis's life. While growing up,

Davis and his siblings were separated and placed in foster care, but Davis remained close with his mother and siblings. Davis's sister, India Owens, described him as compassionate, loving, and selfless. After Davis's discharge from the military, he met a woman named Dawn Henry, with whom he had a son. The child was born with Down Syndrome. Henry testified that while she had trouble adjusting to being a mother of a child with special needs, Davis immediately accepted their son and was consistently present in his life.

Around the time of the robbery, Davis was depressed and upset that he could not afford to do anything for his son's birthday. Davis's mother testified that when Davis purchased the revolver shortly before the robbery, she was concerned that Davis might use it to commit suicide.

## Jury Recommendations and Spencer Hearing

At the conclusion of the penalty phase, the jury unanimously recommended that Davis be sentenced to death for the murders of Bustamante and Luciano. By a vote of eight to four, the jury recommended that Davis be sentenced to death for the murder of baby Michael. The Court subsequently held a Spencer[5] hearing at which both parties presented additional argument but did not present additional evidence.

---

5. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

**Sentencing**

The trial court sentenced Davis to death for the murders of Bustamante and Luciano.  In its sentencing order, the trial court found the existence of six aggravating circumstances as to the murders of both women: (1) the capital felony was committed by a person previously convicted of a felony and on felony probation (some weight); (2) the capital felony was a homicide and was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification (CCP) (great weight); (3) the defendant was contemporaneously convicted of another capital felony or a felony involving the use or threat of violence to the person (very great weight); (4) the capital felony was committed while the defendant was engaged in the commission of, or attempt to commit, or in flight after committing or attempting to commit any robbery or arson (moderate weight); (5) the capital felony was committed for pecuniary gain (little weight); and (6) the capital felony was especially heinous, atrocious, or cruel (HAC) (great weight).[6]  The trial court found a seventh aggravating circumstance as to the murder of Bustamante; the felony was committed for the purpose of avoiding or preventing a lawful arrest (some weight).  The court also evaluated this

---

6. The trial court noted that improper doubling did not occur with the trial court's finding of both murder in the course of a robbery and pecuniary gain, because the jury convicted Davis of separate offenses of armed robbery and first-degree arson.

aggravating circumstance with respect to the murder of Luciano but rejected it as not proven.

The trial court also considered two statutory mitigating circumstances. Due to Davis's prior felony convictions, the trial court rejected as statutory mitigation his argument that he had no significant prior criminal history. However, the trial court did find that the crime was committed while Davis was under the influence of extreme mental or emotional disturbance (little weight). As nonstatutory mitigating circumstances, the trial court found the following: (1) the defendant was the victim of bullying throughout his childhood (slight to moderate weight); (2) the defendant was the victim of sexual assault as a child (slight to moderate weight); (3) the defendant was the victim of both physical and emotional child abuse by a caretaker (moderate weight); (4) the defendant was the victim of overall family dynamics (very little weight); (5) the defendant served in the United States Marine Corps (very little weight); (6) the defendant had a history of being suicidal, both as a child and as an adult (slight weight); (7) the defendant was diagnosed with a personality disorder (slight weight); (8) the defendant had a history of depression (slight weight); (9) stress the defendant was dealing with at the time of the incident (little weight); (10) the defendant was a good person in general (very slight weight); (11) the defendant was a good worker (very slight weight); (12) the defendant was a good son, good sibling, and good husband (very slight weight);

(13) the defendant was a good father to a child with Down Syndrome (moderate weight); (14) the defendant exhibited good behavior during the trial and other court proceedings (very slight weight); and (15) the defendant exhibited good behavior while in jail (little weight).

The trial court overrode the jury's recommendation of death and imposed a sentence of life imprisonment for the murder of Michael. Davis now challenges his convictions and sentences and raises multiple issues for this Court's consideration.

## ISSUES ON APPEAL

On appeal, Davis raises four issues, which we address in turn: (1) whether the trial court erred when it admitted the statements of victim Bustamante as a dying declaration; (2) whether the photopack identifications of Davis, made by victim Greisman and eyewitness Ortiz, should have been excluded; (3) whether photographs of the murder victims were unfairly prejudicial; and (4) whether the trial court improperly found that Davis committed the murder of Bustamante in order to avoid arrest. The State also raises two issues on cross-appeal. However, given our resolution of this direct appeal, we decline to reach the State's cross-appeal.

## I. Dying Declaration of Yvonne Bustamante

Davis argues that the trial court erred when it admitted, as a dying declaration, statements made by Bustamante to Lt. Elrod. While at the scene, Lt. Elrod questioned Bustamante about the events at Headley. When Lt. Elrod asked Bustamante whether she knew the perpetrator's identity, Bustamante identified Davis. Before trial, Davis filed a motion to exclude Bustamante's statements, and the trial court held an extensive evidentiary hearing during which it received testimony from multiple witnesses.

At the hearing, Lt. Elrod testified that when he first approached Bustamante, he observed a badly burned woman lying on a gurney who appeared to be burned over about eighty percent of her body. Lt. Elrod quickly surmised that Bustamante would not survive her injuries. As a result, he began to ask Bustamante pointed questions for the purpose of obtaining her statement. Lt. Elrod testified as follows:

Lt. Elrod:  At that point, I knew she wasn't going to survive the burns.

State:  Did that affect the way that you then began to handle your responsibilities as the first Lake Wales officer to have contact with her?

Lt. Elrod:  Yes, sir.

State:  What—what did you do? Why did you do it?

Lt. Elrod:  I wanted to get her statement before it wouldn't ever be gotten.

- 29 -

State:        Now, normally, if you were the first officer on the scene, someone is being treated by medical personnel, would you just go ahead and start asking them questions if you thought they were going to survive and be in the hospital?

Lt. Elrod:    No, sir. I would have let the medical people try to take care of them.

State:        But in this case, did you go ahead and begin to actually speak with the woman on the gurney and ask her very pointed questions?

Lt. Elrod:    Yes, sir.

When Lt. Elrod asked Bustamante what happened, Bustamante explained that she and Luciano were working when Davis entered their office, demanded money from them, and tried to rob them. She said that when they did not give Davis the money that he wanted, he threw gasoline on them and set them on fire. Lt. Elrod asked her if she knew the perpetrator's identity. Bustamante told him, "yes, it was Leon Davis," and that he was a client of their insurance business. Bustamante appeared coherent and alert, and she spoke clearly in response to Lt. Elrod's questions.

Other witnesses at the evidentiary hearing also testified that they heard Bustamante describe the events at Headley and identify Davis. Additionally, medical personnel testified about Bustamante's grave physical condition, and eyewitness Fran Murray testified that Bustamante stated that she was going to die. Following the hearing, the trial court determined that Bustamante's statements

- 30 -

were admissible as a dying declaration. Her statements were admitted at trial through the testimony of Lt. Elrod and other witnesses.

Davis's argument as to the admission of Bustamante's dying declaration is twofold. First, he encourages this Court to hold that, as a matter of law, the dying declaration is no longer a valid hearsay exception in Florida. Davis argues that the dying declaration is not an exception to the United States Supreme Court's holding in Crawford v. Washington, 541 U.S. 36 (2004) (holding that the admission of a testimonial statement violates a defendant's Sixth Amendment right to confrontation where the declarant is unavailable and the defendant lacked a prior opportunity to cross-examine the declarant). Second, Davis argues that even if the dying declaration survived Crawford, Bustamante's statements to Lt. Elrod did not constitute a valid dying declaration because Bustamante did not have a fear of impending death. As we explain below, we reject both arguments.[7]

---

7. Davis also contends that the trial court erroneously admitted Bustamante's statements under the forfeiture by wrongdoing exception. This argument is without merit. The trial court observed that one of the cases it reviewed while evaluating Davis's dying declaration arguments contained a discussion on forfeiture by wrongdoing, but the court in no way suggested that this doctrine was the basis for its decision. The trial court set forth its conclusions as to the admissibility of Bustamante's statements, and it specified the bases under which it deemed her statements admissible. We therefore reject this argument without further discussion.

**The Dying Declaration and Crawford**

Ratified in 1791, the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. This protection extends to prosecutions in both federal and state courts. See Pointer v. Texas, 380 U.S. 400, 406 (1965). "Indeed, [the United States Supreme Court] ha[s] expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law." Id. at 405. However, "the [Confrontation] Clause permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial." Maryland v. Craig, 497 U.S. 836, 847-48 (1990). One example where such a necessity may arise is in the context of the admission of a declarant's dying declaration.

The admissibility of the dying declaration was recognized at common law on the grounds that such declarations are "made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice." King v. Woodcock, 1 Leach 500, 502, 168

Eng. Rep. 352, 353 (K.B. 1789).  More than a century ago, the United States Supreme Court recognized that "from time immemorial [dying declarations] have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility.  They are admitted, not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice."  Mattox v. U.S., 156 U.S. 237, 243-44 (1895).  "[The dying declaration] exception was well established before the adoption of the constitution, and was not intended to be abrogated.  The ground upon which such exception rests is that, from the circumstances under which dying declarations are made, they are equivalent to the evidence of a living witness upon oath[.]"  Kirby v. U.S., 174 U.S. 47, 61 (1899).

Similarly, Florida has long recognized the dying declaration as a valid exception to the rule against hearsay:

> Dying declarations in cases of homicide form an exception to the rule against the admissibility of hearsay evidence.  The law regards the declarant, when in the presence of imminent and inevitable death, as being under as solemn an inspiration to tell the truth as though he were pledged thereto by oath.  To render such declaration admissible, however, the court must be satisfied that the deceased declarant, at the time of their utterance, knew that his death was imminent and inevitable, and that he entertained no hope whatever of recovery.  This absence of all hope of recovery, and appreciation by the declarant of his speedy and inevitable death, are a preliminary foundation that must always be laid to make such declarations admissible.

- 33 -

Lester v. State, 20 So. 232, 233 (Fla. 1896).

However, Davis argues that in light of the United States Supreme Court's 2004 decision in Crawford, the admission of a testimonial dying declaration violates the Sixth Amendment right of confrontation. This Court has previously recognized that in Crawford the U.S. Supreme Court "held that the introduction of a hearsay statement will result in a violation of the defendant's Sixth Amendment right to confrontation if (1) the statement is testimonial; (2) the declarant is unavailable; and (3) the defendant lacked a prior opportunity for cross-examination of the declarant." Hayward v. State, 24 So. 3d 17, 32 (Fla. 2009). In the present case, the State introduced, as a dying declaration, out-of-court testimonial statements of the declarant, Bustamante. Bustamante was unavailable to testify at trial, and Davis lacked a prior opportunity to cross-examine her. Thus, Davis argues that Bustamante's statements were inadmissible under the holding in Crawford.

Following the evidentiary hearing on Davis's motion to exclude Bustamante's statements, the trial court issued a detailed order in which it found that Bustamante's statements were admissible as a dying declaration. Further, the trial court expressly rejected Davis's argument that Florida's dying declaration exception did not survive Crawford: "This Court specifically finds that the dying declaration has survived Crawford. A dying declaration is an exception to the

- 34 -

Sixth Amendment's Confrontation Clause."  The trial court concluded that "the statements made by Ms. Bustamante to Frances Murray, Vicky Rivera, Evelyn Anderson, Ashley Smith, Lt. Joe E. Elrod, Jr., other law enforcement personnel, or medical personnel, that may be considered to be testimonial in nature, would still be admissible under the hearsay exception for dying declarations, because the dying declaration rule has remained valid post-Crawford."

To date, the United States Supreme Court has not answered whether the dying declaration exception remains viable in light of Crawford.  Yet, in dicta, the Supreme Court has provided some guidance on the matter.  Notably, in Crawford, although the facts of that case did not involve a dying declaration, the Court observed that dying declarations have been the "one deviation" to the rule excluding testimonial hearsay in criminal cases:

> The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. . . .  Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. . . .  We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations.  If this exception must be accepted on historical grounds, it is sui generis.

Crawford, 541 U.S. at 56 n.6 (internal citations omitted).  Subsequently, in Giles v. California, 554 U.S. 353, 358 (2008), the Supreme Court stated: "We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted.  The first of these were

declarations made by a speaker who was both on the brink of death and aware that he was dying." Courts that have confronted the post-Crawford viability of the dying declaration have generally interpreted these statements as strong suggestions by the United States Supreme Court that the dying declaration exception does not run afoul of the Sixth Amendment right of confrontation.[8] Davis now calls upon

---

8. See, e.g., People v. Monterroso, 101 P.3d 956, 972 (Cal. 2004) (concluding that "the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment."); Walton v. State, 603 S.E.2d 263, 265-66 (Ga. 2004) (recognizing that Crawford did not extend its holding to dying declarations); People v. Gilmore, 828 N.E.2d 293, 302 (Ill. App. Ct. 2005) (concluding "that the [United States Supreme] Court does not believe that admitting testimonial dying declarations violates the confrontation clause."); Wallace v. State, 836 N.E.2d 985, 993-96 (Ind. Ct. App. 2005) (rejecting appellant's argument that the dying declaration offends an accused's right to confrontation); State v. Jones, 197 P.3d 815, 821-22 (Kan. 2008) (concluding that "the [United States] Supreme Court would confirm that a dying declaration may be admitted into evidence, even when it is testimonial in nature and is unconfronted."); Commonwealth v. Nesbitt, 892 N.E.2d 299, 310-11 (Mass. 2008) (recognizing Crawford's acknowledgment of the dying declaration as an exception under the Sixth Amendment right of confrontation); State v. Martin, 695 N.W.2d 578, 585-86 (Minn. 2005), abrogated on other grounds by State v. Moua Her, 750 N.W.2d 258, 265 n.5 (Minn. 2008) (holding "that the admission into evidence of a dying declaration does not violate a defendant's Sixth Amendment right to confrontation within the meaning of Crawford because an exception for dying declarations existed at common law and was not repudiated by the Sixth Amendment."); Harkins v. State, 143 P.3d 706, 710-11 (Nev. 2006) (holding that the dying declaration is an exception to the Confrontation Clause); State v. Calhoun, 657 S.E.2d 424, 426-28 (N.C. 2008) (holding that dying declarations do not violate the Sixth Amendment); State v. Lewis, 235 S.W.3d 136, 147-48 (Tenn. 2007) (holding "that this single hearsay exception survives the mandate of Crawford regardless of its testimonial nature"); State v. Beauchamp, 796 N.W.2d 780, 795 (Wis. 2011) (concluding that "a hearsay exception as long-standing, well-established and still necessary as [the dying declaration], . . . cannot lightly be dismissed.").

this Court to determine whether Florida's dying declaration exception remains viable post-Crawford.

### Majority View vs. Minority View

Davis acknowledges that although there is a split of authority on whether the dying declaration survived Crawford, his position, that the exception is no longer viable, reflects the minority view. Nonetheless, he asserts two main points in support of his position. First, Davis argues that Florida's dying declaration exception is inconsistent with the dying declaration that existed at common law, and thus, it does not satisfy Crawford's historical grounds exception. Second, Davis maintains that the dying declaration is not a valid hearsay exception because dying declarations are inherently unreliable. Today, Davis's arguments notwithstanding, this Court joins the overwhelming majority view that the dying declaration exception remains viable post-Crawford. The unique nature and purpose of the dying declaration exception, observed in Crawford and Giles, justifies its continuing utility and validity as an exception to the rule against hearsay. We therefore reaffirm the continued use of the dying declaration in this state in a manner that is consistent with the applicable law that defines the exception.

Davis first argues that Florida's dying declaration exception is no longer valid because the modern exception has evolved from that which existed at common law. Davis asserts that at common law, the justification for admitting a declarant's dying declaration was the declarant's religious belief in the afterlife, and he maintains that in contrast to a justification based on the declarant's religious belief, Florida's existing dying declaration is secular and nondenominational. See § 90.804(2)(b), Fla. Stat. (requiring an unavailable declarant's reasonable belief "that his or her death was imminent, concerning the physical cause or instrumentalities of what the declarant believed to be impending death or the circumstances surrounding impending death."). Consequently, Davis argues, Crawford's "historical grounds" for Florida's dying declaration exception can no longer be used to justify the admission of a dying declaration in Florida's courts. See Crawford, 541 U.S. at 56 n.6.

It is true that "[t]he [dying declaration] hearsay exception has sometimes been justified on the grounds that a dying person was presumed under the common law to have, due to commonly held religious beliefs concerning the afterlife, such a fear of dying without the opportunity to expiate a lie that the reliability of any statement made in those circumstances was deemed equivalent to that of sworn testimony." State v. Beauchamp, 796 N.W.2d 780, 794 (Wis. 2011). Thus, Davis

argues that Florida's dying declaration exception does not fall under the "historical grounds" suggested in Crawford, because it lacks the religious justification that existed at common law. See Crawford, 541 U.S. at 56 n.6.

Davis cites to a footnote in State v. Hailes, 92 A.3d 544 (Md. Ct. App. 2014), aff'd, 113 A.3d 608 (Md. 2015), a Maryland intermediate appellate court decision wherein the court suggests that if the United States Supreme Court were to define "the precise contours of the Dying Declaration that enjoys the exemption . . . it is overwhelmingly probable that the object of the exemption will be the common law Dying Declaration as it was understood to be in 1791." Id. at 567 n.11.[9] Davis also cites to U.S. v. Jordan, No. 04-CR-229-B, 2005 WL 513501 (D. Colo. Mar. 3, 2005), an unpublished memorandum and order in which a federal district court suggests that historical underpinnings do not continue to justify the dying declaration. The court concludes that "there is no rationale in Crawford or otherwise under which dying declarations should be treated differently than any other testimonial statement. This is so especially since the historical underpinnings of the exception fail to justify it." Id. at *3.

---

9. This dicta is consistent with the minority view that Davis urges this Court to adopt. However, the court ultimately held in Hailes that the dying declaration in Maryland remains viable post-Crawford: "This juggernaut of persuasive authority is irresistible. Maryland hereby joins the ranks. We hold that the Dying Declaration, like Forfeiture by Wrongdoing, is exempted from the coverage of the Confrontation Clause." Id. at 567 (footnote omitted).

However, the religious justification as the sole or primary justification of the dying declaration has not been universally accepted.  In 1860, <u>Wigmore on Evidence</u> included the following analysis:

> [A dying declaration] is not received upon any other ground than that of necessity, in order to prevent murder going unpunished. What is said in the books about the situation of the declarant, he being virtually under the most solemn sanction to speak the truth, is far from presenting the true ground of the admission. . . . [T]he rule is no doubt based upon the presumption that in the majority of cases there will be no other equally satisfactory proof of the same facts. <u>This presumption and the consequent probability of the crime going unpunished is unquestionably the chief ground of this exception in the law of evidence.</u>

<u>Wigmore on Evidence</u>, § 1431 (quoting 1 Greenleaf, <u>Evidence</u> § 156, editorial note (1860) (emphasis supplied)).  "It is scarcely necessary to say that, to the rule that an accused is entitled to be confronted with witnesses against him, the admission of dying declarations is an exception which arises from the necessity of the cause." <u>Kirby</u>, 174 U.S. at 61.  A declarant's religious belief notwithstanding, the dying declaration exception recognizes the extraordinary nature of the dying person's ability to speak to the circumstances that placed her in that grave position, and quite possibly to identify the perpetrator and ensure that the one who commits murder is held accountable.  As such, we reject Davis's argument.

Reliability of the Dying Declaration

Davis also argues that dying declarations are inherently unreliable.  He cites to <u>U.S. v. Mayhew</u>, 380 F. Supp. 2d 961, 966 (S.D. Ohio 2005), where a federal

district court expressly "reject[ed] the government's argument that dying declarations are an exception to the Confrontation Clause." Id. at 965. The court stated that it "doubts the inherent reliability of such statements," and it noted the incentives that even a dying person might have to offer false dying statements. Id. at 965 n.5. The court observed:

> For example, the declarant might have been in a revengeful state of mind which would color his dying statements. No longer subject to the fear of retaliation by his enemies, the declarant might falsely incriminate those persons whom he disliked. If the decedent had no religious belief or fear of punishment after death, the statements made while dying would seem to lose much of the trustworthiness traditionally attributed to them. In general, self-serving declarations would be particularly suspect, for the decedent could thereby exculpate himself from questionable association with the circumstances surrounding his death. The declarant's physical and mental state of mind at the moment of death may weaken the reliability of his statements.

Id. (quoting Note, Affidavits, Depositions, and Prior Testimony, 46 Iowa L. R. 356, 375-76 (1961)).

While not impossible, we do think it improbable that a dying person would use the fleeting moments of her earthly existence to, rather than place blame at the feet of her actual murderer, intentionally falsely incriminate someone else. After all, "[t]he admission of the [dying declaration] is justified upon the ground of necessity, and in view of the consideration that the certain expectation of almost immediate death will remove all temptation to falsehood and enforce as strict adherence to the truth as the obligation of an oath could impose." Mattox v. U.S.,

- 41 -

146 U.S. 140, 152 (1892). Consequently, we reject Davis's challenge to the reliability of the dying declaration.

Having concluded that both of Davis's arguments are without merit, we reject his invitation to abrogate Florida's dying declaration exception. Our analysis and the conclusion that we reach today are consistent with that of other jurisdictions that have considered the post-Crawford viability of the dying declaration. For instance, shortly after Crawford was decided, the California Supreme Court decided People v. Monterroso, 101 P.3d 956 (2004), cert. denied, 546 U.S. 834 (2005). In Monterroso, the court rejected the defendant's claim "that Crawford has abrogated the exception for dying declarations." Id. at 972. Concluding that "the holding of Crawford does no such thing," the court observed:

> To exclude such evidence as violative of the right to confrontation would not only be contrary to all the precedents in England and here, acquiesced in long since the adoption of these constitutional provisions, but it would be abhorrent to that sense of justice and regard for individual security and public safety which its exclusion in some cases would inevitably set at naught.

Monterroso, 101 P.3d at 972 (quoting State v. Houser, 26 Mo. 431, 438 (Mo. 1858)). The court concluded: "it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment." Id. (citations omitted).

The Supreme Court of Wisconsin upheld the post-Crawford viability of the dying declaration in Beauchamp, 796 N.W.2d 780. The court reasoned: "If we

were to accept that the Confrontation Clause, as set forth in Crawford's seemingly unbending declaration, requires that all testimonial statements be subject to confrontation to test their reliability, we would exclude dying declarations as, by definition, unconfrontable, and therefore, statements whose reliability cannot be tested." Id. at 791. We agree with the court in Beauchamp that "such a seemingly rigid approach cannot prevail here." Id.

Most recently, the highest appellate court in Maryland, the Special Court of Appeals, affirmed the judgment in Hailes and held that the dying declaration remains viable in Maryland. The state's high court explained:

> Here, we reach the same conclusion that the Supreme Court has consistently endorsed for more than a century, and hold that the Confrontation Clause does not apply to dying declarations. . . . Although it is accurate that, in Crawford and its progeny, the Supreme Court has not yet held that the Confrontation Clause does not apply to dying declarations, our holding is entirely consistent with Crawford and its progeny.

Hailes v. State, 113 A.3d 608, 611 (Md. 2015).

Although Crawford "deliberately avoided the question of how [the holding in Crawford] would apply in a dying declaration case," we are persuaded that the United States Supreme Court has nonetheless "made clear that notwithstanding the categorical language employed in Crawford, there remain situations in which a defendant may not successfully invoke the Confrontation Clause to exclude testimonial hearsay statements." Beauchamp, 796 N.W.2d at 791. The

introduction of a valid dying declaration is such a situation. Thus, we reject

Davis's urging to abrogate the dying declaration exception, and we join the

majority of courts that have considered the post-Crawford viability of the dying

declaration and have concluded that the dying declaration did survive Crawford.

**Whether Bustamante's Statements Qualify as a Dying Declaration**

In light of our holding that Crawford did not abrogate the dying declaration

exception in Florida, we now turn to whether Bustamante's statements to Lt. Elrod

constituted a dying declaration. Davis argues that her statements did not satisfy the

requirements of a dying declaration, and thus, that the trial court erred in admitting

them. "In considering a trial court's ruling on admissibility of evidence over an

objection based on the Confrontation Clause, [this Court's] standard of review is

de novo." McWatters v. State, 36 So. 3d 613, 637 (Fla. 2010) (quoting Milton v.

State, 993 So. 2d 1047, 1048 (Fla. 1st DCA 2008)).

In order for the dying declaration exception to apply, "the deceased must

have known and 'appreciated his condition as being that of an approach to certain

and immediate death,' although it is not necessary that the declarant 'make express

utterances' that he would never recover." Hayward, 24 So. 3d at 30 (quoting

Henry v. State, 613 So. 2d 429, 431 (Fla. 1992)). In determining whether to admit

hearsay as a dying declaration, " 'the court should satisfy itself, on the totality of

the circumstances,' that the deceased knew he was dying." Id. at 30-31 (quoting

- 44 -

_Henry_, 613 So. 2d at 431).  The "absence of all hope of recovery, and appreciation by the declarant of his speedy and inevitable death, are a preliminary foundation that must always be laid to make such declarations admissible."  Id. at 31 (quoting _McRane v. State_, 194 So. 632, 636 (Fla. 1940)).  Based on the totality of the circumstances, the trial court did not err in admitting Bustamante's dying declaration.

Before trial, the trial court held an extensive evidentiary hearing during which the State presented the testimony of witnesses who were in contact with Bustamante at the scene.  One of these witnesses was Fran Murray, who testified as follows:

> She started talking about her kids.  And she said she was in so much pain.  She kept saying it over and over, and that her body hurt so bad, and that she knew that she wasn't going to make it.  She said, please keep me in your prayers.  I'm not going to make it.

The trial court also heard from other witnesses who provided consistent testimony relating to multiple relevant circumstances: (1) Bustamante received extensive burns of the second, third, and fourth degree; (2) she was burned over at least eighty percent of her body; (3) her flesh was falling off of her body; (4) she was in severe pain; and (5) the severity of her burns was indicative of a high probability of death.

Following the hearing, in a detailed order, the trial court ruled as follows regarding the admissibility of Bustamante's statements:

The Court finds that any statements made by Ms. Bustamante to Lt. Joe E. Elrod, Jr., or other law enforcement personnel would be admissible under one of the following hearsay exceptions; a spontaneous statement, an excited utterance, or as a dying declaration.

The Court specifically finds that the statements made by Ms. Bustamante qualify as dying declarations. The evidence shows that Ms. Bustamante reasonably believed her death from her injuries was imminent, particularly in light of her statements to Frances Murray that she was not going to make it, and she should pray for her.

While Bustamante's statement that "she wasn't going to make it" was certainly an important factor for the trial court's consideration, as we did in Hayward, we emphasize that a verbal acknowledgment of impending death is not required in order to find that a declarant's statement constitutes a dying declaration. In this case, the trial court's conclusion was ably supported by testimony of multiple witnesses, who all revealed the dire circumstances that Bustamante faced after Davis set her body on fire.

Davis argues that the testimony of the medical examiner refutes the trial court's conclusion that Bustamante believed that her death was imminent. The medical examiner, Dr. Nelson, testified that Bustamante's pain would have subsided in the areas where she received third- and fourth-degree burns because at that stage of injury, her nerve endings were destroyed. Thus, Davis argues that because Bustamante was burned so severely that she could not feel pain in those areas, she could not have believed that her death was imminent.

We unequivocally reject Davis's argument.  Although Bustamante was eventually unable to feel pain in the areas where she sustained third- and fourth-degree burns, she remained capable of feeling pain in areas where her nerve endings remained intact.  Bustamante, whom medical personnel testified was oriented and alert at the scene, was aware of her extensively burned body.  Assessing her own deeply grave condition, Bustamante told Fran Murray that she did not think that was going to survive.

Davis's assertion that Bustamante's statements were not properly admitted as a dying declaration is simply without merit in light of the totality of the circumstances.  The trial court received a substantial amount of witness testimony about Bustamante's condition that was consistent from witness to witness and also consistent with Bustamante's own observation of her dire circumstances.  Moreover, Bustamante clearly expressed her belief that she was not going to survive.  Thus, we conclude that the trial court properly admitted Bustamante's statements as a dying declaration.

## II.  Identifications by Greisman and Ortiz

At separate times within days of the robbery, eyewitnesses Greisman (shooting victim) and Ortiz offered out-of-court identifications of Davis after viewing his photograph in a photopack (also known as a photographic lineup).  Both men also identified Davis in court during their trial testimony.  Davis argues

that these identifications were unreliable and should have been excluded as evidence. As we explain, we find that this argument is without merit. The circumstances surrounding each witness's identification are as follows.

Greisman testified that upon reaching the vicinity of the Headley building, he observed Davis walking towards him. Greisman saw Davis's face clearly and made eye contact with him. Greisman thought that Davis was responding to the fire and that he intended to offer assistance. Instead, Davis shot him in the face. After being transported to the hospital, Greisman underwent surgery and remained in the hospital overnight. He was not allowed to watch television, and he denied seeing any newspaper or other media accounts during his hospital stay. When Greisman was released from the hospital, his mother drove him to the Lake Wales Police Department to speak to two detectives. While at the police station, Greisman viewed a photopack containing six photographs, one of which was a photograph of Davis. When asked if he recognized the person who shot him, Greisman quickly recognized Davis's photograph, and he placed his initials next to it. Greisman identified Davis again from the witness stand at trial.

Similarly, Ortiz identified Davis as the shooter and testified that he saw Davis's face clearly. After Greisman was shot, Ortiz looked Davis in the eyes and maintained his view of Davis because he was concerned that Davis would attack him. Four days after the events at Headley, Ortiz viewed a photopack containing

Davis's photograph. Ortiz easily identified Davis as the perpetrator. In addition to Ortiz's observations of Davis at the time of the shooting, Ortiz testified that he recognized Davis as someone whom he saw at the Florida Natural Growers juice plant. Ortiz, who previously worked at Florida Natural Growers as a temporary worker, testified that he saw Davis near a gate where workers enter and exit.

**Validity of the Out-of-Court Identifications/Photopacks**

First, Davis contends that the photopacks shown to Greisman and Ortiz were unnecessarily suggestive and that as a result, their out-of-court identifications of Davis were invalid. Greisman and Ortiz were each shown a photopack that was printed on a piece of letter-sized paper and contained six photographs. The photographs were divided into two rows, with three photographs on each row. The lower left corner of each photograph contained an identifying number ranging from one through six. Below the bottom row of photographs were six sets of book-in numbers, each of which corresponded to one of the photographs. Each of the numbers contained between seven and eleven digits and was printed in small font. Davis's book-in number contained the number 2007, and the other photographs each contained the number 93 or 94, representing the year that the photograph was taken. As a result, Davis argues that the more recent number, 2007, unnecessarily suggested that his was the suspect's photograph.

"This Court has adopted a two-part test to determine whether an out-of-court identification may be admitted: First, whether police used an unnecessarily suggestive procedure to obtain an out-of-court identification, and, second, if so, considering all the circumstances, whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." Green v. State, 641 So. 2d 391, 394 (Fla. 1994) (citing Grant v. State, 390 So. 2d 341, 343 (Fla. 1980)). When evaluating the likelihood of misidentification, a court should consider:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Rimmer v. State, 825 So. 2d 304, 316 (Fla. 2002) (quoting Grant, 390 So. 2d at 343). However, where the procedure used to obtain the out-of-court identification was not unnecessarily suggestive, the likelihood of irreparable misidentification need not be explored. See id. As we explain, we conclude that the out-of-court identifications made by Greisman and Ortiz were not unnecessarily suggestive.

Davis argues that the placement of the number 2007 in his book-in number distinguished it from the other book-in numbers that contained the numbers 93 and 94. To that end, he cites three cases that also involved the use of a date in a photographic lineup: Henderson v. U.S., 527 A.2d 1262 (D.C. App. 1987), State v. Davis, 504 A.2d 1372 (Conn. 1986), and Brown v. Commonwealth, 564 S.W.2d

24 (Ky. Ct. App. 1978). However, in each of these cases, the year or the date was placed <u>on</u> the suspect's photograph.

One of these cases, <u>Brown</u>, is especially demonstrative of an unnecessarily suggestive photographic lineup. In <u>Brown</u>, a case involving the appeal of two defendants' robbery convictions, the appellate court detailed the following facts:

> The seven photographs shown Lineberry and Scott were mug shots from the files of the Jefferson County Police Department. In each photograph a board was suspended from around the neck of the individual. Each board contained information for identification purposes. In the case of Brown and Hill [the appellants], each board contained the abbreviation "ROB" and the date "November 17, 1975." In the other five photographs, the boards did not contain the robbery date of November 17, 1975, nor were any two dates the same. Only one of the other five photographs contained the abbreviation "ROB."

<u>Id.</u> at 26. These facts, which include the unequivocal use of the date of the crime and the abbreviation "ROB" within the suspects' photographs, demonstrate an unnecessarily suggestive photograph. Davis's facts fall far short of these.

The photopacks shown to Greisman and Ortiz contained, beneath the entire set of photographs, six sets of book-in numbers that corresponded to the photographs above. The numbers were printed in small font and were innocuous. Both Greisman and Ortiz quickly identified Davis's photograph. Therefore, we reject Davis's argument that the book-in numbers rendered the photopacks unnecessarily suggestive. Because the photopacks were not unnecessarily

- 51 -

suggestive, the trial court did not err in admitting the out-of-court identifications made by Greisman and Ortiz.

## Validity of the In-Court Identifications

Second, Davis argues that the in-court identifications made by Greisman and Ortiz are invalid. He primarily asserts that the in-court identifications were rendered unreliable by the earlier use of unnecessarily suggestive photopacks. However, because the photopacks were not unnecessarily suggestive and did not invalidate Greisman's and Ortiz's out-of-court identifications, Davis's argument that the photopacks rendered their in-court identifications invalid is without merit.

Davis's remaining challenges to Ortiz's in-court identification similarly do not warrant relief. First, Davis contends that Ortiz's identification is unreliable because of inconsistencies in Ortiz's various statements regarding whether he saw Davis in news coverage before viewing the photopack. However, Ortiz had an independent opportunity to view Davis <u>at the crime scene</u>. Moreover, the defense had ample opportunity to attack Ortiz's identification at trial.

Second, Davis contends that Ortiz's in-court identification was unreliable because Ortiz insisted that the car he saw near the crime scene was a black Nissan Maxima, not a Nissan Altima. This discrepancy does not render Ortiz's identification of Davis himself unreliable. Just as the trial court did not err when it

admitted the out-of-court identifications made by Greisman and Ortiz, the court

likewise did not err when it admitted their in-court identifications.

### III. Victim Photographs

Davis argues that the trial court erred in admitting nearly four dozen autopsy

and hospital photographs of Bustamante, Luciano, and Michael, and he maintains

that the photographs were irrelevant to any material fact in issue. Davis did not

object to the admission of these photographs at trial. As such, if this Court

concluded that the admission of the photographs was erroneous, Davis would only

be entitled to relief upon a showing of fundamental error. See Harrell v. State, 894

So. 2d 935, 941 (Fla. 2005) ("As we have noted, the sole exception to the

contemporaneous objection requirement is fundamental error."). However, as we

explain below, we conclude that the trial court did not err in admitting the victims'

photographs. Therefore, Davis is not entitled to relief.

"The test for the admissibility of photographic evidence is relevance, not

necessity." Mansfield v. State, 758 So. 2d 636, 648 (Fla. 2000). This Court has

explained the following regarding the admissibility of gruesome photographs:

> This Court has long followed the rule that photographs are
> admissible if they are relevant and not so shocking in nature as to
> defeat the value of their relevance. Where photographs are relevant,
> "then the trial judge in the first [instance] and this Court on appeal
> must determine whether the gruesomeness of the portrayal is so
> inflammatory as to create an undue prejudice in the minds of the jury
> and [distract] them from a fair and unimpassioned consideration of the
> evidence." We have consistently upheld the admission of allegedly

- 53 -

> gruesome photographs where they were independently relevant or corroborative of other evidence.

Czubak v. State, 570 So. 2d 925, 928 (Fla. 1990) (citations omitted).  For example, photographs are admissible if "they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted."  Bush v. State, 461 So. 2d 936, 939 (Fla. 1984).  Moreover, photographs are admissible "to show the manner of death, location of wounds, and the identity of the victim."  Larkins v. State, 655 So. 2d 95, 98 (Fla. 1995).

There was no error—fundamental or otherwise—in the admission of the victims' photographs.  The photographs were relevant to explain the nature of the victims' injuries and manner of death.  Five color photographs of Michael's body were introduced as well as two x-ray photographs.  The photographs were relevant to Dr. Nelson's testimony regarding Michael's death from extreme prematurity.

Eighteen autopsy photographs of Bustamante were admitted into evidence.  These photographs assisted the medical examiner in testifying about the degree of Bustamante's burns, the percentage of body surface area burned, the incisions that were necessary to enable blood flow, the swelling caused by extensive fluid loss, the absence of burns consistent with being bound, and the cause of death from thermal burns.

Fourteen autopsy photographs and seven hospital photographs of Luciano were admitted into evidence.  The photographs assisted the medical examiner in

testifying about the percentage of body surface area burned, the degree of burns, the skin grafts that were done to try to treat her severe burns, the absence of burns consistent with being bound, and the cause of death from thermal burns.

Davis is correct in that the photographs of the severely burned women and the deceased infant in this case are gruesome. However, the photographs were relevant to prove the nature and extent of each victim's injuries, and their causes of death, and were not "so inflammatory as to create an undue prejudice in the minds of the jury and [distract] them from a fair and unimpassioned consideration of the evidence." Czubak, 570 So. 2d at 928. What is more, "[t]hose whose work products are murdered human beings should expect to be confronted by photographs of their accomplishments." Arbelaez v. State, 898 So. 2d 25, 44 (Fla. 2005) (quoting Henderson v. State, 463 So. 2d 196, 200 (Fla. 1985)). Thus, there was no error in admitting the photographs.

### IV. Avoid Arrest

Davis also argues that the trial court improperly found that the murder of Bustamante was committed to avoid arrest. We disagree. "The avoid arrest aggravating circumstance, which is also referred to as witness elimination, applies when the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or to effectuate an escape from custody." Wright v. State, 19 So. 3d 277, 301 (Fla. 2009). While this aggravating circumstance is usually applied to the

murder of law enforcement personnel, it has also been applied to the murder of a witness to a crime. Id. (citing Consalvo v. State, 697 So. 2d 805, 819 (Fla. 1996)). "Where the victim is not a law enforcement officer, the evidence must demonstrate beyond a reasonable doubt that 'the sole or dominant motive for the murder was the elimination of the witness.' " Id. (quoting Preston v. State, 607 So. 2d 404, 409 (Fla. 1992)). The State sought to prove the avoid arrest aggravating circumstance as to both Bustamante and Luciano. However, the court found "that the State failed to prove beyond a reasonable doubt that the sole or dominant motive for the murder of Juanita Luciano was to eliminate a witness."

"In reviewing the trial court's finding of an aggravating circumstance, this Court's 'task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.' " Russ v. State, 73 So. 3d 178 (Fla. 2011) (quoting McWatters, 36 So. 3d at 642).

While the evidence that Davis's dominant motive for the murder of Bustamante was to eliminate her as a witness is circumstantial, this Court has upheld trial court findings of the avoid arrest aggravating circumstance based on circumstantial evidence. See Hernandez v. State, 4 So. 3d 642, 667 (Fla. 2009). "Even without direct evidence of the offender's thought process, the arrest avoidance factor can be supported by circumstantial evidence through inference

from the facts shown." Swafford v. State, 533 So. 2d 270, 276 n.6 (Fla. 1988).

Such circumstantial evidence includes "whether the victim knew and could

identify the killer." Hernandez, 4 So. 3d at 667. Other factors include "whether

the defendant used gloves, wore a mask, or made any incriminating statements

about witness elimination; whether the victims offered resistance; and whether the

victims were confined or were in a position to pose a threat to the defendant."

Farina v. State, 801 So. 2d 44, 54 (Fla. 2001).

The trial court's finding that Davis murdered Bustamante in order to avoid

arrest is supported by competent, substantial evidence. One, the State presented

evidence that Davis knew Bustamante and had an established business relationship

with her at Headley. The court relied on testimony regarding Bustamante's long-

term employment at Headley and her specific involvement with Davis's insurance

matters. Two, when Davis entered the Headley building, he placed duct tape over

the surveillance camera lens. Such conduct, like wearing a mask, is an act of

attempting to hide one's identity. Three, the trial court concluded that after being

bound with duct tape, Bustamante did not pose a threat to Davis. Four, Davis shot

Bustamante in addition to setting her body on fire. The trial court's finding that

Davis murdered Bustamante in order to eliminate her as a witness was based on

competent, substantial evidence. Thus, we affirm the trial court's finding of this

aggravating circumstance.

## V. Sufficiency of the Evidence

Although Davis does not challenge the sufficiency of the evidence on which the State relied to obtain the convictions, in every death case, this Court must independently evaluate for the sufficiency of the evidence relied upon to convict the defendant. See Caylor v. State, 78 So. 3d 482, 500 (Fla. 2011). "In conducting this review, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006) (citing Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)). In this case, there is sufficient evidence to sustain Davis's convictions.

The facts indicate that Davis, while suffering financial distress, planned the robbery of the Headley Insurance Agency. Less than one week before the robbery, he obtained a .357 magnum revolver, and on the morning of the robbery, he purchased multiple items from Walmart that he used during the commission of his crimes. These items included a cigarette lighter and a cooler to conceal the revolver. Two witnesses testified that they spoke with Davis in Walmart that morning. One of the witnesses, Jennifer DeBarros, had known Davis and his family for years, and she easily recalled the conversation because she knew that they talked on Davis's son's birthday.

While being treated at the crime scene, Bustamante identified Davis as the person who, around 3 p.m., entered Headley and demanded money from her and from Luciano. Bustamante also stated that when they refused to give him money, Davis bound them with duct tape, doused them in gasoline, and set them on fire.

Multiple eyewitnesses observed a man fitting Davis's description leaving Headley while the building was still on fire. These eyewitnesses saw Davis placing a gun into a cooler, the description of which was consistent with the one that Davis purchased at Walmart that morning. Additionally, two eyewitnesses, Greisman and Ortiz, quickly identified Davis after being shown a photopack that contained Davis's photograph.

The description of a car seen near Headley at the time of the robbery was consistent with that of the black Nissan Altima driven by Davis. That car, which was later found in the parking lot of a nightclub, was searched. Two floormats retrieved from the car tested positive for the presence of gasoline. Gasoline was the accelerant used to ignite the fires at Headley. Davis's driver license was found inside of the car.

The projectile retrieved from Bustamante's hand was consistent with having been fired from the .357 magnum revolver that Davis purchased just days before the robbery. Additionally, the projectiles retrieved from the crime scene were also consistent with having been fired from that weapon.

Davis's conduct after the robbery also adds to the competent, substantial evidence of his guilt. He entered a credit union branch less than forty-five minutes after the Headley alarm was activated and deposited $148 in his account that previously had a balance of $5.33. The bank teller, who was familiar with Davis, observed an injury to his face as did others who observed him after the robbery. Witnesses, including members of Davis's family, testified regarding his suspicious behavior following the robbery. Competent, substantial evidence of guilt supports Davis's convictions.

## VI. Proportionality of Davis's Death Sentences

This Court is required to conduct "a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." Offord v. State, 959 So. 2d 187, 191 (Fla. 2007) (quoting Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003)). "This entails 'a qualitative review . . . of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.' " Id. (quoting Urbin v. State, 714 So. 2d 411, 417 (Fla. 1998)). Thus, in determining whether a death sentence is proportionate, this Court does not simply compare the number of aggravating circumstances versus the number of mitigating circumstances. See id.

The trial court found seven aggravating circumstances as to the murder of Bustamante: (1) committed by a person previously convicted of a felony and on felony probation (some weight); (2) CCP (great weight); (3) Davis was contemporaneously convicted of another capital felony or a felony involving the use or threat of violence to the person (very great weight); (4) committed while Davis was engaged in the commission of, or attempt to commit, or in flight after committing or attempting to commit any robbery or arson (moderate weight); (5) committed for the purpose of avoiding or preventing a lawful arrest (some weight); (6) capital felony was committed for pecuniary gain (little weight); and (7) HAC (great weight). The trial court noted that improper doubling did not occur with the trial court's finding of both murder in the course of a robbery and pecuniary gain, because the jury convicted Davis of separate offenses of first-degree arson and armed robbery. As to the murder of Luciano, the trial court found all of the same aggravating circumstances except for the avoid arrest aggravator. The trial court also found as a statutory mitigating circumstance that Davis was under the influence of extreme mental or emotional disturbance (little weight); and fifteen nonstatutory mitigating circumstances, which ranged from very slight weight to moderate weight.

This case is truly among the most aggravated and least mitigated. Two of the aggravating circumstances found in this case, HAC and CCP, have repeatedly

been identified by this Court as "two of the most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999). "As a result, when these two aggravators are present, the mitigating circumstances must be of considerable weight to overcome them." Brown v. State, 143 So. 3d 392, 405-06 (Fla.) (citing Abdool v. State, 53 So. 3d 208, 224 (Fla. 2010)), cert. denied, 135 S. Ct. 726 (2014).

This Court has affirmed sentences of death in similar cases. In this Court's decision in Brown, the defendant poured gasoline on the victim and used a lighter to set her on fire. Brown, 143 So. 3d at 396. After sixteen days in a burn unit, the victim died from her injuries. Id. at 397. As aggravating circumstances, the trial court found CCP, HAC, and that the murder was committed while Brown was engaged in the commission of a kidnapping. Id. at 401. Similar to the present case, the trial court found the existence of one statutory mitigating circumstance (no significant history of prior criminal activity). Id. The trial court also found twenty-seven nonstatutory mitigating circumstances. Id.

Brown is both factually comparable and comparable in terms of the weighty aggravating circumstances found by the trial court. Brown is also similar in terms of the nature of the mitigating circumstances found by the trial court. Yet, as in Brown, we conclude here that "[t]he mitigation . . . pales in comparison to the weighty aggravation." Id. at 406.

In another comparable case, during the course of a robbery, the defendant set two women on fire in a fabric store. Henry, 613 So. 2d at 430. The trial court found as aggravating circumstances that the murders were "committed during the commission of robbery and arson, to avoid or prevent arrest, for pecuniary gain, and in a cold, calculated, and cruel manner and that they were heinous, atrocious, or cruel." Id. at 432. The trial court found the existence of one statutory mitigating circumstance (no prior criminal history) and one nonstatutory mitigating circumstance (prior military service). This Court upheld Henry's death sentences and determined that the aggravating circumstances were "established beyond a reasonable doubt." Id. at 433. In the present case, the trial court's finding of greater nonstatutory mitigation than in Henry does not render Davis's death sentences disproportionate. For just as the trial court found greater nonstatutory mitigation, it also found significantly greater aggravation.

We agree that the aggravating circumstances found by the trial court in this case were established beyond a reasonable doubt and that they exceedingly outweigh Davis's mitigating circumstances. Thus, Davis's death sentences satisfy this Court's proportionality requirement.

## VII.  Hurst v. Florida

While Davis's appeal was pending, the United States Supreme Court issued Hurst v. Florida, in which it held that Florida's capital sentencing scheme violated

the Sixth Amendment.  See 136 S. Ct. at 621.  The Supreme Court concluded that

"[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to

impose a sentence of death.  A jury's mere recommendation is not enough."  Id. at

619.  Davis's request to file supplemental briefing to address the impact of Hurst v.

Florida on his sentences was granted.  On remand from the Supreme Court, we

held that "in addition to unanimously finding the existence of any aggravating

factor, the jury must also unanimously find that the aggravating factors are

sufficient for the imposition of death and unanimously find that the aggravating

factors outweigh the mitigation before a sentence of death may be considered by

the judge."  Hurst v. State, 41 Fla. L. Weekly S433, S437 (Fla. Oct. 14, 2016)

(Hurst).  We further held that a unanimous jury recommendation is required before

a trial court may impose a sentence of death.  See id.  Finally, we determined that

Hurst v. Florida error is capable of harmless error review.  See id. at S442.

Accordingly, at issue is whether any Hurst v. Florida error during Davis's

penalty phase proceedings was harmless beyond a reasonable doubt.  In Hurst, we

explained the standard by which harmless error should be evaluated:

> Where the error concerns sentencing, the error is harmless only if
> there is no reasonable possibility that the error contributed to the
> sentence.  See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000).
> Although the harmless error test applies to both constitutional errors
> and errors not based on constitutional grounds, "the harmless error
> test is to be rigorously applied," [State v. ]DiGuilio, 491 So. 2d
> [1129,] 1137 [Fla. 1986], and the State bears an extremely heavy
> burden in cases involving constitutional error.  Therefore, in the

- 64 -

context of a Hurst v. Florida error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:

> The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.

DiGuilio, 491 So. 2d at 1139. "The question is whether there is a reasonable possibility that the error affected the [sentence]." Id.

Id. (alteration in original). As applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravating factors that outweighed the mitigating circumstances.

With regard to Davis's sentences, we emphasize the unanimous jury recommendations of death. These recommendations allow us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors. The instructions that were given informed the jury that it needed to determine whether sufficient aggravators existed and whether the aggravation outweighed the mitigation before it could recommend a sentence of death. See Fla. Std. Jury Instr. (Crim.) 7.11 ("If . . . you determine that no aggravating circumstances are found to exist, or that the

- 65 -

mitigating circumstances outweigh the aggravating circumstances, or, in the absence of mitigating factors, that the aggravating factors alone are not sufficient, you must recommend imposition of a sentence of life in prison without the possibility of parole rather than a sentence of death."). The jury was presented with evidence of mitigating circumstances and was properly informed that it may consider mitigating circumstances that are proven by the greater weight of the evidence. See id. ("If you determine by the greater weight of the evidence that a mitigating circumstance exists, you may consider it established and give that evidence such weight as you determine it should receive in reaching your conclusion as to the sentence to be imposed.").

Even though the jury was not informed that the finding that sufficient aggravating circumstances outweighed the mitigating circumstances must be unanimous, and even though it was instructed that it was not required to recommend death even if the aggravators outweighed the mitigators, the jury did, in fact, unanimously recommend death. See id. ("If, after weighing the aggravating and mitigating circumstances, you determine that at least one aggravating circumstance is found to exist and that the mitigating circumstances do not outweigh the aggravating circumstances, or, in the absence of mitigating factors, that the aggravating factors alone are sufficient, you may recommend that a sentence of death be imposed rather than a sentence of life in prison without the

possibility of parole.  Regardless of your findings in this respect, however, you are neither compelled nor required to recommend a sentence of death.").  From these instructions, we can conclude that the jury unanimously made the requisite factual findings to impose death before it issued the unanimous recommendations.  Further supporting our conclusion that any Hurst v. Florida error here was harmless are the egregious facts of this case—Davis set two women on fire, one of whom was pregnant, during an armed robbery, and shot in the face a Good Samaritan who was responding to the scene.  The evidence in support of the six aggravating circumstances found as to both victims was significant and essentially uncontroverted.[10]

We conclude that the State can sustain its burden of demonstrating that any Hurst v. Florida error was harmless beyond a reasonable doubt.  Here, the jury unanimously found all of the necessary facts for the imposition of death sentences by virtue of its unanimous recommendations.  In fact, although the jury was informed that it was not required to recommend death unanimously, and despite the mitigation presented, the jury still unanimously recommended that Davis be sentenced to death for the murders of Bustamante and Luciano.  The unanimous

10. Additionally, as previously discussed, the avoid arrest aggravating circumstance as to victim Bustamante is supported by competent, substantial evidence.

recommendations here are precisely what we determined in <u>Hurst</u> to be constitutionally necessary to impose a sentence of death. Accordingly, Davis is not entitled to a new penalty phase.

## CONCLUSION

For these reasons, we affirm Davis's convictions and sentences. It is so ordered.

LABARGA, C.J., and PARIENTE, and LEWIS, JJ., concur.
CANADY and POLSTON, JJ., concur in result.
PERRY, J., concurs in part with an opinion, in which QUINCE, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PERRY, J., concurring in part and dissenting in part.

I concur with the majority's finding that the evidence here is sufficient to sustain Davis's convictions; however, I cannot agree with the majority's finding that the <u>Hurst v. Florida</u>, 136 S. Ct. 616 (2016), error was harmless beyond a reasonable doubt simply because the evidence supporting the aggravators was "significant and essentially uncontroverted." <u>See</u> majority op. at 67. To the extent that I would not find the error harmless, I dissent.

In <u>Hurst v. State</u> (<u>Hurst</u>), 41 Fla. L. Weekly S433 (Fla. Oct. 14, 2016), we declined to speculate why the jurors voted the way they did; yet, because here the jury vote was unanimous, the majority is comfortable substituting its weighing of the evidence to determine which aggravators each of the jurors found. Even

- 68 -

though the jury unanimously recommended the death penalty, whether the jury unanimously found each aggravating factor remains unknown.

In Hurst, we held that for a defendant to be eligible for a death sentence, a jury must unanimously find the existence of each aggravating factor, that the aggravating factors are sufficient, and that the aggravating factors outweigh the mitigating circumstances. Hurst, 41 Fla. L. Weekly at S442. Additionally, we held that the jury's death sentence recommendation must be unanimous. Id. While I agreed in Hurst that Hurst v. Florida errors are subject to harmless error review, see Hurst, 41 Fla. L. Weekly at S441-442, I believe the majority's conclusion that the error was harmless beyond a reasonable doubt in this case is mistaken.

Davis was convicted for three murders, and despite the same jury hearing the aggravation and mitigation in all three cases, the jury only voted unanimously to recommend a death sentence for two of the victims. For the remaining sentence, the jury vote was eight to four, and the trial judge reduced the sentence to life imprisonment.

For each of the three murders, the jury was presented with evidence to support and instructed on eight aggravating circumstances: (1) that Davis was previously convicted of a felony and on felony probation; (2) that Davis was contemporaneously convicted of another capital felony or a felony involving the use or threat of violence; (3) that the capital felony was committed during the

course of a felony (robbery/arson); (4) that the capital felony was committed for the purpose of avoiding lawful arrest; (5) that the capital felony was committed for pecuniary gain; (6) that the capital felony was especially heinous, atrocious, or cruel; (7) that the capital felony was committed in a cold, calculated, and premeditated manner; and (8) that the victim of the capital felony was under the age of twelve. Of these aggravators, three are clearly established by the evidence—previous felony conviction, contemporaneous felony, and committed during the course of a robbery. The remaining aggravators for each required factual finding that under Hurst must now be considered and weighed by a jury. The majority concludes that the error is harmless because no reasonable jury would have failed to find the aggravating factors given the evidence. Yet, even with the additional circumstance of the age of the victim that applied to Michael Bustamante, Jr., the jury nevertheless did not unanimously recommend a death sentence as it related to Michael Bustamante. We simply cannot assume that every juror found every aggravator beyond a reasonable doubt.

The majority's reweighing of the evidence to support its conclusion is not an appropriate harmless error review. The harmless error review is not a sufficiency of the evidence test, and the majority's analysis should instead focus on the effect of the error on the trier of fact. State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986). By ignoring the record and concluding that all aggravators were

unanimously found by the jury, the majority is engaging in the exact type of conduct the United States Supreme Court cautioned against in <u>Hurst v. Florida</u>. <u>See</u> <u>Hurst v. Florida</u>, 136 S. Ct. at 622.

Because the harmless error review is neither a sufficiency of the evidence review "nor a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence," <u>see</u> <u>DiGuilio</u>, 491 So. 2d at 1138, I conclude that the error here was harmful.

QUINCE, J., concurs.

An Appeal from the Circuit Court in and for Polk County,
    J. Michael Hunter, Judge - Case No. 532007CF00938601XXXX

Howard L. Dimmig, II, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Marilyn Muir Beccue, Assistant Attorney General, Tampa, Florida,

    for Appellee