# Supreme Court of Florida

————

No. SC2021-1779

————

**LEON DAVIS, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

————

No. SC2022-0883

————

**LEON DAVIS, JR.,**
Petitioner,

vs.

**RICKY D. DIXON, etc.,**
Respondent.

February 1, 2024

PER CURIAM.

Leon Davis, Jr., a prisoner under sentences of death, appeals the circuit court's denial of his initial motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. He also

petitions this Court for a writ of habeas corpus. We have jurisdiction. *See* art. V, §§ 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the denial of postconviction relief and deny the habeas petition.

The murders involved in this postconviction appeal and habeas proceeding occurred on December 7, 2007, at a BP gasoline station and convenience store in Polk County. Davis was sentenced to death following a bench trial, and his convictions and sentences were affirmed on direct appeal. *See Davis v. State*, 207 So. 3d 177 (Fla. 2016).

Davis is also the appellant in another 3.851 postconviction appeal, *Davis v. State*, SC2021-1778, and the habeas petitioner in *Davis v. Dixon*, SC2022-0882. The murders in these cases occurred at the Headley Insurance Agency in Polk County several days after the BP murders, and the opinion in these cases is also released today.

During Davis's bench trial for the BP murders, a limited amount of relevant Headley evidence was introduced.[1] Where it is

---

1. On direct appeal, this Court affirmed the introduction of a limited amount of Headley evidence which included "eyewitness

necessary to distinguish between these cases, they will be referred

to as "Headley" or "BP."

## FACTS AND PROCEDURAL BACKGROUND

On direct appeal, this Court set forth the facts of the BP

murders and related crimes as follows:

> On the evening of December 7, 2007, Davis drove to the vicinity of a BP gas station and convenience store (BP) with the intent to commit robbery. The BP was located near the intersection of Highway 557 and Interstate 4 in Polk County. Around 8:51 p.m. that evening, BP employee Dashrath Patel (Dashrath) and his friend Pravinkumar Patel (Pravinkumar) walked out of the convenience store's front door and across the parking lot to change the gas price sign.
>
> The BP had closed for the evening, and the convenience store lights were turned off. While talking on the telephone, another BP employee, Prakashkumar Patel (Prakashkumar), remotely locked the store's front door and began to change the gas prices on the cash register. Seconds later, the surveillance camera captured a person who appeared to be a black man, about six feet tall, who approached the front door of the store and pulled on the door. The man, who had a large build, was dressed in dark clothing and wore a hood and a face mask.
>
> Prakashkumar indicated to the man that the store was closed. The man then raised a gun to the window and fired one shot into the store towards Prakashkumar.

testimony [that] identif[ied] Davis as the Headley shooter, plac[ed] a black Nissan in the vicinity of the Headley building at the time of the shootings, and establish[ed] that the same gun was used in both the BP and the Headley shootings." *Davis*, 207 So. 3d at 189.

- 3 -

Suddenly, the shooter's attention was drawn to Dashrath and Pravinkumar, and he ran across the parking lot toward them. Surveillance footage showed both men with their hands in the air, and Prakashkumar reported hearing two gunshots that occurred about five to ten seconds apart. According to the surveillance footage, the gunshots were fired at approximately 8:53 p.m. After firing the gunshots, the shooter ran back to the store's locked front door and tried in vain to open it. He raised his gun again, but he then turned and ran away from the scene.

In the meantime, Prakashkumar had activated the silent alarm, called 9-1-1, and sheltered in the storeroom. Upon arrival at the scene, the responding deputies learned that there were two missing people. Following a brief search, the bodies of Dashrath and Pravinkumar were located. Both victims were shot in the head execution-style with .38 caliber bullets.

With the assistance of a trained K-9 search dog, law enforcement searched the immediate area for the scent of a person who may have recently left the scene. The K-9 detected a scent that tracked about one quarter of a mile to the north of the gas station. Footprints led in the same direction that the K-9 tracked, up to the point where a set of tire tracks began. A crime scene technician photographed and made casts of the tire tracks.

In the days following the murders, law enforcement conducted traffic stops in the area of the BP to question drivers who may have seen something pertinent on the evening of the murders. During the course of these stops, four people provided information regarding a car that was parked that evening in an isolated area near the gas station. The witnesses described a dark-colored car, possibly a black Nissan, backed up against a gate. One of the witnesses described the car as having a distinctive grille on the front end.

Davis was not identified as a suspect in the December 7 BP murders until after the December 13

robbery, arson, and shootings at the Headley Insurance Agency in Lake Wales (Headley). Davis was positively identified as the perpetrator of those crimes. The lead detective in both the BP and the Headley investigations was Detective Ivan Navarro. Detective Navarro requested an analysis of the ballistics evidence obtained during the course of the BP and Headley investigations. The results of the analysis demonstrated that the same gun was used in the crimes at the BP and at Headley.

During the Headley investigation, a black Nissan Altima with a distinctive grille was seized from the parking lot of a local nightclub, and during a search of the car, Davis's driver license was found inside. Additionally, two dark-colored jackets were found in the car's trunk, and a pair of black gloves was found in the glove compartment. In light of the witness reports that a possibly black Nissan was parked near the BP on the evening of December 7, Detective Navarro requested an analysis of the BP tire casts and the tires from the Nissan Altima linked to Davis to look for similarities. The tires from Davis's Nissan Altima were consistent with the BP tire casts.

A grand jury later indicted Davis for multiple counts stemming from the BP events: two counts of first-degree murder, one count of attempted first-degree murder, one count of attempted armed robbery, and one count of possession of a firearm by a convicted felon.

*Guilt Phase*

Davis waived a jury trial in favor of a bench trial. The State's theory was that Davis was a man burdened by significant financial distress and that he committed the murders of Dashrath and Pravinkumar during the course of an attempted armed robbery of the BP.

Evidence admitted at the trial revealed the following. At the time of the murders, Davis and his wife, Victoria, were in debt and unemployed. Victoria was pregnant at the time and was on a leave of absence from work due to pregnancy complications. The mortgage payment for the

couple's home was delinquent, and the couple had given up driving one of their vehicles and cancelled their cell phone accounts because of their financial troubles. The couple shared Victoria's black Nissan Altima.

On the day of the BP murders, Davis purchased a Dan Wesson .357 magnum revolver from his cousin, Randy Black. Black also gave Davis .38 caliber bullets which were compatible with the .357 magnum. Davis returned home after purchasing the revolver, but he left home again that evening between 6 and 7 p.m. Davis was alone when he left, and he was driving the black Nissan Altima. Davis did not return home until between 9 and 9:30 p.m. Davis's home was a twenty-two to twenty-three minute drive from the BP.

Two days after the murders, Davis showed his mother the revolver that he purchased from Black. The known rifling characteristics of Davis's revolver, six lands and six grooves with right twists, were consistent with the characteristics of the projectiles obtained during the BP investigation, including the projectiles removed from the heads of the victims. The State's ballistics expert testified that .38 caliber projectiles could be fired from a .357 magnum firearm, and that the projectiles obtained during the BP investigation were consistent with having been fired from a Dan Wesson .357 magnum revolver.

The State introduced evidence from the Headley trial during the guilt phase of the BP trial. To prevent the introduction of improper evidence, the trial court entered a pretrial order that sharply limited the admissibility of Headley evidence. The limited Headley evidence revealed that on the morning of December 13, 2007, Davis went to the Lake Wales Walmart to make a purchase. Surveillance video footage obtained from the store depicted a tall black man entering the store around 7 a.m., and both a store manager and an employee positively identified the man in the video as Davis. While at Walmart, Davis purchased an orange lunch cooler.

That afternoon, Davis went to Headley, where he encountered Headley employee Yvonne Bustamante and

shot her in her left hand. Shortly thereafter, Davis encountered Brandon Greisman near the Headley building. Greisman and his neighbors, who lived nearby, had walked towards the Headley building upon noticing the presence of smoke in the area. Greisman, who saw Davis and thought that he was there to offer help, saw Davis pull a gun out of an orange lunch bag and point it in his direction. Greisman tried to get away but was unable to do so before Davis shot him in the nose. Greisman was transported to Lake Wales Hospital, where he underwent surgery and remained in the hospital overnight.

When Greisman was released, his mother drove him to the Lake Wales Police Department to speak to detectives. Greisman was shown a photographic lineup and asked if he recognized the man who shot him the day before. Greisman recognized Davis's photograph almost immediately and identified him as the shooter. At trial, Greisman also identified Davis from the witness stand.

Eyewitness Carlos Ortiz, who saw Davis place the gun into a lunch bag shortly after Greisman was shot, also identified Davis as the Headley shooter. At trial, Ortiz testified that in addition to getting an extended look at Davis at the scene, he recognized Davis because he previously saw Davis at Florida Natural Growers, where both men used to work. A few days after the Headley incident, Ortiz identified Davis's photograph from a photographic lineup. Ortiz also identified Davis from the witness stand.

Another Headley eyewitness, Fran Murray, testified that as she approached the Headley building, she saw a tall black man carrying an orange collapsible lunch pail, and she saw him place what appeared to be a gun inside of it.

Evelyn Anderson, a Headley customer, saw a tall black man exit the Headley building with a bag under his arm.

Ortiz and Murray also testified that they saw a black car in the area of the Headley building around the

time of the shooting. The car was parked near a vacant house. Murray described the car as mid-sized, and Ortiz identified it as a Nissan.

Davis was also identified by the dying declaration of Yvonne Bustamante. Upon arriving at the Headley scene, Lt. Joe Elrod asked Bustamante if she knew the perpetrator's identity, and she responded, "Leon Davis." Bustamante told Lt. Elrod that Davis was a former Headley customer. In addition to Lt. Elrod, two emergency medical responders and eyewitness Anderson heard Bustamante identify Davis as the perpetrator.

The State's ballistics expert testified that the same gun was used in the BP murders and in the shootings at Headley.

*Davis's Defense*

Davis's defense was misidentification. He offered an alibi for the time of the murders and attacked the eyewitness identifications made during the course of the Headley investigation.

Testifying in his own defense, Davis stated that on December 7, 2007, he brought his son to his home. Around 7:15 p.m., he left home alone to go Christmas shopping at the mall. Davis admitted that he was driving the black Nissan Altima at the time. While shopping, Davis did not see anyone that he recognized. Davis testified that although he spent around $150 in cash on clothing purchases, he did not have documentation for the purchases. He also testified that the money that he used to go shopping came from money that he had at home and a paycheck he had received the day before.

Davis testified that he left the mall around 8:30 p.m. and returned home around 9 p.m. He stated that he spent the rest of the evening at home with his family, leaving only briefly with his family between 9 and 10 p.m. to get dinner.

Davis also testified that less than one week later, he left the Nissan Altima parked at a nightclub, and that the gloves and jacket that the police later found in the car

- 8 -

belonged to his wife, Victoria. Davis testified that he kept an unloaded gun in a toolbox in the garage that may have been unlocked, and that neither Victoria nor his son knew about the gun.

Davis was convicted as charged.

*Davis*, 207 So. 3d at 183-86.

*Penalty Phase and Sentencing*

Davis waived a penalty phase jury, and the penalty phase proceeded before the trial court. Following the penalty phase, the trial court held a *Spencer*[2] hearing. Ultimately, the trial court sentenced Davis to death for the murders of Dashrath and Pravinkumar. The trial court found that the following aggravating factors applied to each murder: (1) the capital felony was committed by a person previously convicted of a felony and on felony probation (moderate weight); (2) the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person (very great weight); and (3) the capital felony was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing a robbery (great weight). The trial court rejected as not proven that either

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

- 9 -

capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. *Davis*, 207 So. 3d at 188.

The trial court found the existence of one statutory mitigating circumstance: the crime was committed while Davis was under the influence of extreme mental or emotional disturbance (little weight). The trial court also considered but rejected as statutory mitigation that Davis had no significant prior criminal history, because Davis was convicted of grand theft several months before the BP murders. *Id.*

The trial court also found fifteen nonstatutory mitigating circumstances and assigned varying weights: (1) the defendant was the victim of bullying throughout childhood (moderate weight); (2) the defendant was the victim of sexual assault as a child (moderate weight); (3) the defendant was the victim of child abuse, both physical and emotional, by a caretaker (moderate weight); (4) the defendant's overall family dynamics (little weight); (5) the defendant's military service in the U.S. Marine Corps (little weight); (6) the defendant's history of being suicidal both as a child and as an adult (slight weight); (7) the defendant's diagnosed personality

- 10 -

disorder (slight weight); (8) the defendant's history of depression (slight weight); (9) stressors at the time of the incident (little weight); (10) the defendant was a good person in general (very slight weight); (11) the defendant was a good worker (little weight); (12) the defendant was a good son, good sibling, good husband (moderate weight); (13) the defendant was a good father to a child with Down Syndrome (moderate weight); (14) the defendant's good behavior during trial as well as other court proceedings (slight weight); and (15) the defendant's good behavior while in jail and in prison (little weight). *Id.*

In addition to the sentences of death for the murders of Dashrath and Pravinkumar, the court also sentenced Davis to life imprisonment with a twenty-year minimum mandatory sentence for the attempted murder of Prakashkumar, twenty years of imprisonment with a twenty-year minimum mandatory sentence for attempted armed robbery, and fifteen years of imprisonment with a three-year minimum mandatory sentence for possession of a firearm by a convicted felon. *Id.*

## DIRECT APPEAL

Davis raised twelve issues on direct appeal. *Id.* at 188-89.[3]

This Court affirmed Davis's convictions and sentences. *See Davis*, 207 So. 3d at 212.

---

3. On direct appeal, Davis argued the following: (1) whether the trial court erred in admitting evidence of the Headley events during the guilt phase; (2) whether the trial court relied on facts not in evidence to find Davis guilty; (3) whether the trial court erred by allowing the impeachment of Victoria Davis; (4) whether the trial court improperly shifted the burden of proof to Davis; (5) whether the trial court erroneously used Davis's prior theft convictions as circumstantial evidence of his guilt for all charges; (6) whether the trial court erred in denying the motion for judgment of acquittal; (7) whether the evidence is sufficient to support Davis's attempted robbery conviction; (8) whether the trial court erred in admitting the hearsay statement of Yvonne Bustamante as a dying declaration; (9) whether the trial court erred in allowing the prosecution to introduce the pretrial and in-court identifications made by Brandon Greisman and Carlos Ortiz; (10) whether the trial court abused its discretion and distorted the weighing process by improperly diminishing the weight assigned to two mitigating factors and attributing a greater weight to one aggravator than was previously assigned; (11) whether Davis's death sentences are proportionate; and (12) whether the Florida death penalty statutory scheme is facially unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002).

## 3.851 MOTION & EVIDENTIARY HEARING

Davis filed his initial motion for postconviction relief raising twenty-two claims and several subclaims.[4] On August 23-24, 2021,

---

4. Davis's 3.851 motion argued the following claims: (1) trial counsel failed to move to dismiss the indictment based on the fact that the grand jury neither deliberated on nor found the requisite elements for a capital felony charge; (2) trial counsel failed to move to bar the State from seeking the death penalty given that there was no allegation of aggravators in the indictment; (3) trial counsel failed to bar the State from arguing a felony murder theory because the grand jury only found the elements for a charge of first-degree premeditated murder; (4) trial counsel failed to seek a change of venue and jury trial due to the notoriety of the case; (5) trial counsel failed to fully advise Davis of the consequences of waiving his right to a jury trial; (6) trial counsel failed to aggressively litigate a motion to suppress an automobile search; (7) trial counsel failed to use available evidence to show flaws in the State's hypothesis of prosecution; (8) trial counsel failed to test the State's case by failing to call certain witnesses and failing to present certain evidence; (9) trial counsel failed to request a special jury instruction on circumstantial evidence; (10) trial counsel was ineffective due to a failure to request a special jury instruction on dying declarations; (11) trial counsel failed to argue that the aggravators should have been tried in the guilt phase as elements of the offense; (12) trial counsel failed to argue that the maximum sentence allowed under the jury's verdict was life imprisonment; (13) trial counsel should have requested a jury instruction regarding the presumption of a life sentence; (14) trial counsel failed to argue that his sentence violated the Eighth Amendment prohibition against cruel and unusual punishment; (15)(a) trial counsel failed to thoroughly investigate Davis's background and present complete social history mitigation; (15)(b) trial counsel failed to thoroughly investigate Davis's background and present sufficient mental health mitigation; (15)(c) Davis's waiver of a mental health evaluation was not knowing, intelligent and voluntary; (16) Davis was deprived of his

- 13 -

the trial court held a two-day joint evidentiary hearing on certain

claims raised in Davis's BP and Headley postconviction motions. As

to the BP motion, the trial court granted an evidentiary hearing on

claim 7 (trial counsel failed to use available evidence to show flaws

in the State's hypothesis of prosecution), claim 15(a) (trial counsel

failed to thoroughly investigate Davis's background and present

complete social history mitigation), claim 16 (Davis was deprived of

---

right to a reliable adversarial testing at the *Spencer* hearing given trial counsel's failure to ensure the preparation of a comprehensive pre-sentencing investigation report and provide additional mitigation evidence; (17) Davis was deprived of a full adversarial testing due to counsel's ineffectiveness and the State's *Giglio v. United States*, 405 U.S. 150 (1972), and *Brady v. Maryland*, 373 U.S. 83 (1963), violations; (18) trial counsel failed to aggressively litigate a motion to suppress a stale search warrant; (19) trial counsel failed to use available evidence to challenge the State's case; (20)(a) trial counsel failed to thoroughly investigate firearms identification evidence; (20)(b)(1) trial counsel failed to file a motion in limine to exclude or limit the ballistics evidence, or alternatively, to request a hearing under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); (20)(b)(2) trial counsel failed to object to the conclusion of firearms analyst James Kwong that the bullets fired at the BP gas station were fired from the same firearm used in the Headley case; (20)(b)(3) trial counsel failed to question Kwong as to his qualifications, methods, protocols, and the basis for his conclusions; (20)(b)(4) trial counsel failed to provide expert testimony challenging Kwong's findings regarding the firearms comparison evidence; (21) trial counsel failed to move to suppress, based on a chain of custody violation, a photopack shown to Greisman; and (22) cumulative error.

- 14 -

his right to a reliable adversarial testing at the *Spencer* hearing given trial counsel's failure to ensure the preparation of a comprehensive pre-sentencing investigation report and provide additional mitigation evidence), claim 17 (Davis was deprived of a full adversarial testing due to counsel's ineffectiveness and the State's violations of *Giglio* and *Brady*, and claims 20(a) (trial counsel failed to thoroughly investigate firearms identification evidence), 20(b)(3) (trial counsel failed to question the State's firearms expert (Kwong) as to his qualifications, methods, protocols, and the basis for his conclusions), and 20(b)(4) (trial counsel failed to provide expert testimony challenging Kwong's findings regarding the firearms comparison evidence). Portions of claim 15 that related to counsel's investigation and presentation of mental health mitigation were dismissed after the court held a hearing on and granted the State's motion to strike the presentation of all mental health evidence at the evidentiary hearing.

Six witnesses testified at the evidentiary hearing: (1) James Kwong (Florida Department of Law Enforcement (FDLE) firearms analyst); (2) Dr. Jeff Salyards (defense postconviction forensics expert); (3) Dr. James Hamby (State's postconviction ballistics

expert); (4) Officer Lynette Schwarze (formerly Officer Lynette Townsel) (Headley detective)[5]; (5) Robert Norgard, Esq. (lead defense counsel); and (6) the appellant, Leon Davis.

The circuit court denied relief on all claims. Davis now appeals the denial of postconviction relief and petitions for a writ of habeas corpus.

## POSTCONVICTION APPEAL

Davis raises ten claims in his postconviction appeal. Specifically, he argues that the court erred in denying his claims of a *Giglio* violation, a *Brady* violation, ineffective assistance of trial counsel, and cumulative error. Davis also argues that the postconviction court erred in not ordering a competency evaluation before the evidentiary hearing. We address each issue in turn.

### I. *Giglio*

Davis argues that in violation of *Giglio*, a police officer who was involved in the Headley investigation testified falsely during the BP trial. Specifically, Davis alleges that Officer Lynette Townsel falsely

---

5. To remain consistent with the witness's name on direct appeal, this opinion will use the last name "Townsel."

testified about her handling of a photopack (or photographic lineup) of possible Headley suspects. Davis's identity as the shooter in the Headley case was relevant to identifying him as the shooter in the BP case because the State's firearms expert concluded that the same firearm was used in both cases.

"To establish a *Giglio* violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." *Sheppard v. State*, 338 So. 3d 803, 827 (Fla. 2022) (citing *Duckett v. State*, 231 So. 3d 393, 400 (Fla. 2017)). While the burden rests with Davis to demonstrate that the State knowingly presented false testimony, upon doing so, the burden shifts to the State to establish that the testimony was not material. *See id.* The State must prove that the error was harmless beyond a reasonable doubt, meaning that "there is no reasonable possibility that the error contributed to the conviction." *State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986). As we explain, because the officer's testimony was not material, we affirm the circuit court's order denying this claim.

Consistent with the trial court's order permitting a limited amount of relevant evidence from the Headley trial to be introduced

at the BP trial, Officer Townsel testified that she met with shooting victim Greisman at the Lake Wales Police Department on the day after the Headley incident. During that meeting, she showed Greisman a photopack that included Davis's photograph, and Greisman quickly identified Davis as the shooter.

Davis argues that Officer Townsel falsely testified that she placed a copy of the photopack in evidence storage after Greisman identified Davis.[6] The record does reveal that in May 2010, the State and the defense discovered that neither the original nor a copy of the photopack was located in evidence storage. That discovery set in motion an extensive search that led to Officer Townsel finding the original photopack in a shed at her home a few weeks later.

However, Davis's *Giglio* claim fails because the State has demonstrated beyond a reasonable doubt that Officer Townsel's testimony was not material. We reject Davis's argument that the testimony improperly bolstered the authenticity of the original

---

6. Another of Officer Townsel's statements, that the defense received a copy of the photopack, was stricken upon objection at trial.

photopack and Greisman's in-court identification where, during the cross-examination of Officer Townsel, defense counsel established that no copy of the photopack was placed in evidence storage.

Moreover, the original photopack was introduced into evidence at trial, and both Greisman and Officer Townsel verified its authenticity during their testimony. Counsel testified at the evidentiary hearing that he was unable to substantiate any claim that the original photopack had been tampered with.

Further, the photopack was not the only evidence admitted during the BP trial that identified Davis as the Headley shooter. Multiple eyewitnesses testified to Bustamante's statement identifying Davis as the person who shot her. Additionally, eyewitness Ortiz saw Davis placing a gun into a bag shortly after Davis shot Greisman. Ortiz was shown a photopack from which he quickly identified Davis, and that photopack was properly stored in evidence storage. Ortiz also identified Davis while on the witness stand and testified that he had seen Davis at a former worksite prior to the day of the Headley incident.

Officer Townsel's testimony was harmless beyond a reasonable doubt, as there is no reasonable possibility that the testimony

contributed to Davis's conviction. For these reasons, we affirm the circuit court's denial of Davis's *Giglio* claim.

## II. *Brady*

Davis also argues that the State committed a *Brady* violation by withholding the personnel file of Officer Townsel, which would have indicated that Officer Townsel did not initially place the original Greisman photopack in evidence storage, and that she was suspended for three days for mishandling the photopack. "To establish a *Brady* violation, a defendant must show: (1) evidence favorable to the accused, because it is either exculpatory or impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that prejudice ensued." *Guzman v. State*, 868 So. 2d 498, 508 (Fla. 2003) (citing *Jennings v. State*, 782 So. 2d 853, 856 (Fla. 2001)).

"To establish materiality or prejudice under *Brady*, the defendant 'must demonstrate . . . a reasonable probability that the [factfinder's] verdict would have been different had the suppressed information been used at trial.'" *Sheppard*, 338 So. 3d at 827 (quoting *Smith v. State*, 931 So. 2d 790, 796 (Fla. 2006)).

We affirm the circuit court's denial of this claim. Davis's failure to demonstrate prejudice is determinative of this issue, as Officer Townsel was impeached at trial on her mishandling of the photopack. The trial court was aware that the original photopack was missing for more than two years and was found in 2010 in Officer Townsel's shed.

Moreover, as we explained with respect to Davis's *Giglio* claim, the photopack was not the only evidence linking Davis to the Headley shooting. Multiple eyewitnesses overheard Bustamante identify Davis as the person who shot her. Ortiz identified Davis as the Headley shooter shortly after the incident and at trial. Thus, we affirm the circuit court's denial of Davis's *Brady* claim.

### III. Cross-examination of the State's Firearms Expert

Davis argues that defense counsel was ineffective for failing to robustly cross-examine the State's firearms expert, FDLE firearms analyst James Kwong. In particular, Davis maintains that counsel's cross-examination inadequately challenged alleged deficiencies in the Association of Firearm and Tool Mark Examiners (AFTE) theory of identification employed by Kwong and the majority of firearm and tool mark analysts. As a result, Davis argues,

counsel failed to effectively undermine the State's theory that Davis

was the BP shooter and that the murder weapon was the .357

magnum that Davis bought on the day of the BP murders. The

circuit court properly denied this claim.

Davis's claims of ineffective assistance of trial counsel are

governed by the standard set forth in the United States Supreme

Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984).

This Court has explained:

> First, counsel's performance must be shown to be
> deficient. *Strickland v. Washington*, 466 U.S. 668, 687
> (1984). Deficient performance in this context means that
> counsel's performance fell below the standard guaranteed
> by the Sixth Amendment. *Id.* When examining counsel's
> performance, an objective standard of reasonableness
> applies, *id.* at 688, and great deference is given to
> counsel's performance. *Id.* at 689. The defendant bears
> the burden to "overcome the presumption that, under the
> circumstances, the challenged action 'might be
> considered sound trial strategy.' " *Id.* (quoting *Michel v.
> Louisiana*, 350 U.S. 91, 101 (1955)). This Court has
> made clear that "[s]trategic decisions do not constitute
> ineffective assistance of counsel." *See Occhicone v. State*,
> 768 So. 2d 1037, 1048 (Fla. 2000). There is a strong
> presumption that trial counsel's performance was not
> ineffective. *See Strickland*, 466 U.S. at 669.
> Second, the deficient performance must have
> prejudiced the defendant, ultimately depriving the
> defendant of a fair trial with a reliable result. *Strickland*,
> 466 U.S. at 689. A defendant must do more than
> speculate that an error affected the outcome. *Id.* at 693.
> Prejudice is met only if there is a reasonable probability

that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Both deficient performance and prejudice must be shown. *Id.* Because both prongs of the *Strickland* test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo.

*Sheppard*, 338 So. 3d at 816 (quoting *Bradley v. State*, 33 So. 3d 664, 671-72 (Fla. 2010)). "Because *Strickland* requires a defendant to establish both prongs, if one prong is not met, the Court need not reach the other." *See id.* (citing *Stewart v. State*, 801 So. 2d 59, 65 (Fla. 2001)).

Davis has not demonstrated that counsel's cross-examination was deficient. Counsel testified that his strategy was to undermine Kwong's testimony linking Davis to the firearm used in the BP and Headley shootings. Kwong testified that the BP and Headley bullets and bullet fragments were fired from the same firearm. However, during counsel's cross-examination, Kwong conceded that they could have been fired from either a .357 magnum or a .38 caliber firearm. Moreover, Kwong acknowledged that the firearm could have been made by one of at least twenty-one different

- 23 -

manufacturers.  Kwong also admitted that he could not exclude a 9mm firearm as the suspect firearm, but he indicated that it was less likely than a .357 magnum or .38 caliber because the lands and grooves on the bullets and bullet fragments that he examined were inconsistent with those that would be made by a 9mm firearm.

Thus, counsel was able to gain concessions from the State's firearms expert that the murder weapon could have been a different caliber of firearm than the .357 magnum that Davis bought on the day of the BP murders, and that twenty-one different firearms could have produced the same firing characteristics.  Counsel's cross-examination of Kwong did not constitute deficient performance.  Thus, Davis has not established ineffective assistance of counsel, and we affirm the circuit court's ruling.

**IV. Expert to Challenge Firearm and Tool Mark Evidence**

Davis also argues that counsel was ineffective for failing to obtain an expert to challenge the State's firearm and tool mark evidence, and that the circuit court improperly denied this claim.  However, Davis is not entitled to relief.

At the evidentiary hearing, Davis presented the testimony of an experienced forensic scientist, Dr. Jeff Salyards, to support his

argument that counsel should have utilized conflicting expert testimony to undermine Kwong's firearm analysis. Dr. Salyards, who is not trained in firearm and tool mark examination, criticized the AFTE theory of identification as lacking in scientific reliability.

The failure to offer testimony such as that of Dr. Salyards does not render counsel's strategy objectively unreasonable. Counsel testified at the evidentiary hearing that after researching trial techniques for challenging ballistics evidence, he consulted with an experienced ballistics expert, Terry LaVoy. Counsel had consulted with LaVoy in prior cases and was familiar with his work. In this case, counsel litigated a motion to ensure that LaVoy had access to the State's evidence, and upon examination, LaVoy concluded that the bullets and bullet fragments in the BP case and the Headley case were fired from the same firearm. Counsel explained that if he could not disprove the conclusion reached by the State's expert, he did not believe that arguing general criticisms about firearms examination was an effective strategy. Instead, counsel decided that he would focus on the fact that multiple types of firearms other than the .357 magnum that Davis purchased could have been used

in the shootings. Counsel's use of experts was based on his strategic decision-making and was not deficient.

Moreover, even if Dr. Salyards had been allowed to testify at Davis's trial, his testimony would have validated Kwong's testimony in that (1) the crime lab that Dr. Salyards previously supervised used training, equipment, and quality control standards fairly similar to the AFTE method; (2) despite his criticism of the AFTE method, Dr. Salyards was unaware of an international organization that utilized a different theory of identification for training firearms examiners; and (3) Dr. Salyards conceded that the comparative microscope method utilized by Kwong to evaluate the BP and Headley bullets and bullet fragments is the most widely used method to determine whether two bullets were fired from the same gun.

Because Davis has failed to show deficient performance, his claim of ineffective assistance fails. We affirm the circuit court's denial of this claim.

### V. BP Surveillance Video

Davis also argues that counsel was ineffective for failing to use certain parts of the BP surveillance video to counter the State's

theory that only one person committed the BP crimes. At trial, the State argued that Davis parked his wife's Nissan Altima down the street from the BP, walked to the BP, committed his crimes, walked back to the car, and drove away. Davis maintains that aspects of the surveillance video would have been favorable to the defense; in particular, that footage of an SUV driving through the BP lot shortly after the perpetrator was seen supports a finding that a second person, such as a getaway driver, was involved. The circuit court properly denied this claim.

At the evidentiary hearing, counsel testified that he carefully reviewed the surveillance footage and hired an expert to review it and advise the defense team. In consultation with the expert and the defense team, counsel concluded that nothing seen on the video supported a theory that two people were involved in the crimes. Moreover, counsel concluded that the surveillance footage could not have been used to challenge the State's theory. We agree with the circuit court that "[t]he mere fact that the video shows an SUV approach nearby as the perpetrator ran back towards the store after killing two men fails to show any involvement by another individual." Counsel's performance was not deficient.

Moreover, four witnesses testified that they saw a vehicle resembling Victoria Davis's Nissan Altima near the BP on the night of the murders, and the State presented evidence that tire casts made from the area where the car was seen were consistent with the tires on that car.

Because counsel evaluated the surveillance video and made a strategic decision not to rely on it to argue the possibility of a second perpetrator, his performance was not deficient. We affirm the circuit court's denial of this claim.

## VI. Reasonable Doubt

Davis also argues that the circuit court improperly denied an evidentiary hearing on certain claims, including his claim that counsel failed to present evidence that would have created reasonable doubt of his guilt. "To be entitled to an evidentiary hearing on a claim of ineffective assistance, the defendant must allege specific facts that are not conclusively rebutted by the record and which demonstrate a deficiency in performance that prejudiced the defendant." *Jones v. State*, 845 So. 2d 55, 65 (Fla. 2003). "Failure to sufficiently allege both prongs results in a summary

denial of the claim." *Spera v. State*, 971 So. 2d 754, 758 (Fla. 2007) (citing *Thompson v. State*, 796 So. 2d 511, 514 n.5 (Fla. 2001)).

Here, Davis challenges the summary denial of his claim that counsel was ineffective for failing to challenge the State's handling of missing video footage from the area near the Headley building. Davis contends that the footage, captured by the dashboard camera of a police car at the Headley scene, could have helped prove that he was not the perpetrator of the Headley crimes and thus would have undermined the State's evidence linking him to the BP crimes. In particular, he suggests that the footage could have been used to impeach Lieutenant Elrod's testimony that Bustamante identified Davis as the shooter. The circuit court did not err in summarily denying this claim.

The circuit court correctly concluded that Davis did not establish his entitlement to an evidentiary hearing. In addition to the speculative nature of Davis's claim, deposition testimony in the record indicates that the footage at issue was extremely limited in nature. Sergeant Griffin Crosby, who reviewed the footage during the investigation, testified during his pretrial deposition that the footage captured (1) the scene as the responding officer drove onto

the Headley parking lot, (2) the Headley building itself, and (3) the movement of various individuals such as emergency personnel. Thus, the record undermines Davis's assertion that the footage could have been used to impeach Lieutenant Elrod's testimony or otherwise disprove that Davis committed the crimes at Headley.

As the circuit court observed: "There is nothing to indicate any of the contents of this video are exculpatory or helpful in any way to Mr. Davis and any such assertions are based on mere speculation." We affirm the circuit court's order denying an evidentiary hearing on this claim.

## VII. Search Warrant

Davis also argues that he was entitled to an evidentiary hearing on his claim that counsel failed to aggressively litigate a motion to suppress evidence obtained from Victoria Davis's Nissan Altima. A search warrant for the car was signed and timely executed on the day after the Headley incident, but the return of the warrant was not made until September 2008.

"[W]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth

Amendment claim is meritorious." *Zakrzewski v. State*, 866 So. 2d 688, 694 (Fla. 2003) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). Moreover, "even if a motion to suppress would have been granted, the defendant must show that there is a reasonable probability the result of the proceeding would have been different if not for counsel's error." *Sanchez-Torres v. State*, 322 So. 3d 15, 21 (Fla. 2020) (citing *Abdool v. State*, 220 So. 3d 1106, 1112 (Fla. 2017)). Davis maintains that counsel's performance prejudiced him in the BP case because the State relied on evidence retrieved from the car to convict him of the Headley murders, and those convictions were ultimately a part of the basis for sentencing him to death for the BP murders.

The circuit court did not err in denying an evidentiary hearing on this claim. Counsel filed a motion in the Headley case to suppress the search warrant. The motion identified several possible grounds for suppression, including the delayed warrant return. The trial court held a suppression hearing at which counsel argued in support of the motion. In denying the motion, the trial court concluded—and in considering this postconviction claim, the circuit court agreed—that the timely executed search warrant was valid

- 31 -

despite the delayed warrant return. *See State v. Featherstone*, 246 So. 2d 597, 599 (Fla. 3d DCA 1971) (concluding that the delayed return of a timely executed warrant did not render a warrant void, but acknowledging an exception where the defendant can demonstrate prejudice).

Moreover, the evidence retrieved from Victoria Davis's Nissan Altima and admitted during the Headley trial was not the only evidence that linked Davis to the Headley incident. Although only a limited amount of Headley evidence was admissible during the BP trial, the trial court properly admitted evidence that Bustamante, as testified to by Lieutenant Elrod and other eyewitnesses, identified Davis as the person who shot her. Additionally, the State introduced evidence that the bullet removed from Bustamante's hand was consistent with the bullets removed from the BP victims' heads, and the State's firearms expert testified that (1) all of the bullets and bullet fragments were fired from the same firearm, and (2) all had rifling characteristics consistent with the Dan Wesson .357 magnum that Davis bought on the day of the BP murders. Davis is not entitled to relief.

## VIII. Photopack

Davis argues that the circuit court should have granted an evidentiary hearing on his claim that counsel was ineffective for failing to file a motion—based on chain of custody grounds—to suppress (1) the photopack from which Headley shooting victim Greisman identified Davis as the person who shot him, and (2) Greisman's in-court identification of Davis. Given the State's evidence that the same firearm was used in the Headley and BP incidents, the State relied on Greisman's identification of Davis as the Headley shooter as a part of its proof that Davis was the BP shooter. Greisman testified at the BP trial and verified the authenticity of the original photopack, and he identified Davis from the witness stand.

Because the original photopack—also at issue in the previously discussed *Giglio* and *Brady* claims—was not properly placed in evidence storage, Davis argues that counsel should have moved to suppress the photopack on chain of custody grounds as well as Greisman's in-court identification. The circuit court did not err in summarily denying this claim.

Counsel was not deficient for failing to file a motion to suppress based on chain of custody, as there was no basis for suppression. In order to suppress the photopack, Davis would have been required to establish probable tampering. *See Peek v. State*, 395 So. 2d 492, 495 (Fla. 1980) ("Relevant physical evidence is admissible unless there is an indication of probable tampering."). However, as the circuit court observed, Davis offered only speculation that the photopack was tampered with during the time that it was not in evidence storage. Moreover, both Greisman and Officer Townsel testified that the photopack was the original. Thus, Davis could not have prevailed on a motion to suppress based on chain of custody. We agree with the circuit court's conclusion:

> Clearly, Officer Townsel did not follow the proper procedure by failing to place the photo pack securely in evidence immediately after Mr. Greisman made the identification. However, Mr. Davis has offered only speculation that the location of the photo pack prior to being placed into evidence resulted in tampering. Such bare allegations are insufficient to render the evidence inadmissible. *See Terry v. State*, 668 So. 2d 954, n.4 (Fla. 1996); *Bush v. State*, 543 So. 2d 283, 284 (Fla. 2d DCA 1989). Instead, the testimony from Officer Townsel and Mr. Greisman reflect[s] the original was entered into evidence at the time of trial. As Officer Townsel testified at the evidentiary hearing, the photo pack was unaltered in any way.

- 34 -

Moreover, because Davis has failed to demonstrate that the photopack identification was tainted, he has failed to establish that Greisman's in-court identification should have been suppressed. We affirm the circuit court's ruling.

## IX. Cumulative Error

Davis argues that "[t]he sheer number and types of errors in Mr. Davis's trial, when considered as a whole, virtually dictated his conviction." This claim of cumulative error is without merit, and the circuit court properly denied relief.

First, Davis has not demonstrated any instances of counsel's deficiency. Thus, there is no cumulative error analysis to conduct with respect to his ineffective assistance of counsel claims. *See Sheppard*, 338 So. 3d at 829 (concluding that no cumulative prejudice analysis of the appellant's ineffective assistance of counsel claims was required where "trial counsel was not deficient in any respect").

Second, as to Davis's *Giglio* and *Brady* claims, even assuming actions by the State that fell within the meanings of *Giglio* and *Brady*, these instances taken together do not establish the requisite prejudice for relief based on cumulative error.

## X. Competency Evaluation

Before Davis's evidentiary hearing, the State filed a motion to dismiss portions of Davis's penalty phase postconviction claim and to exclude mental health evidence from the hearing. The circuit court ultimately granted the State's motion, and Davis argues that the court erred by not ordering that he be evaluated for competency before doing so. Davis contends that the court's failure to order a competency evaluation before the 2021 evidentiary hearing was primarily motivated "by the length of time Mr. Davis's case was on the docket, the state's sense of urgency in adhering to the schedule, and the judicial backlog created by the COVID pandemic." However, Davis's argument is without merit, as he has not demonstrated that there were reasonable grounds for the court to order a competency examination.

"The substantive standard for competence to proceed is 'whether the defendant has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and whether the defendant has a rational as well as factual understanding of the pending collateral proceedings.'" *Kocaker v. State*, 311 So. 3d 814, 820 (Fla. 2020) (quoting Fla. R. Crim. P.

3.851(g)(8)(A)).  A postconviction court's determination of whether to order a competency examination is governed by Florida Rule of Criminal Procedure 3.851(g)(3), which provides:

> If, at any stage of a postconviction proceeding, the court determines that there are reasonable grounds to believe that a death-sentenced defendant is incompetent to proceed and that factual matters are at issue, the development or resolution of which require the defendant's input, a judicial determination of incompetency is required.

Although Davis cites multiple pages in the postconviction record as evidence "sufficient . . . to raise a bona fide doubt as to [his] competency to proceed," not only does the record fail to raise doubts about his competency, it contradicts Davis's claim.

In arguing that his competency should have been evaluated, Davis focuses on the contentious relationship with one of his former postconviction attorneys.  He emphasizes that certain letters and portions of hearing transcripts are evidence that he lacked competency to proceed.  Contrary to Davis's assertion, however, these communications reveal not someone whose competency is in doubt, but instead, a very sophisticated defendant.  Davis demonstrated familiarity with the substance of *Giglio* claims and

*Huff*[7] hearings, and he was well-informed about the motions filed on his behalf. Davis also criticized how the attorney worded various postconviction claims and argued that the attorney was not pursuing meritorious claims. Thus, the record does not reveal that Davis's competence to proceed was in doubt.

Moreover, the fact that Davis was indecisive about allowing his attorneys to pursue mental health claims does not substantiate his claim that a competency examination was warranted.

Because the court had no reasonable grounds to believe that Davis was incompetent to proceed, there was no error in not ordering a competency examination.

## PETITION FOR WRIT OF HABEAS CORPUS

Davis argues that the trial court improperly relied on his prior felony convictions for grand theft as proof of his guilt in the BP case, and that appellate counsel was ineffective for failing to raise this issue as a federal claim on direct appeal. "In general, claims of ineffective assistance of appellate counsel are properly presented in a petition for writ of habeas corpus . . . ." *Brown v. State*, 304 So.

_____

7. *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

3d 243, 278 (Fla. 2020) (citing *Baker v. State*, 214 So. 3d 530, 536 (Fla. 2017)); *Wickham v. State*, 124 So. 3d 841, 863 (Fla. 2013). The record establishes that Davis is not entitled to relief.

On direct appeal, Davis's initial brief contained the following argument:

> By using the grand theft convictions for the purpose of casting Davis in a bad light, as a convicted felon who committed a new crime when he obtained a gun from his cousin, and then citing that as circumstantial evidence of his guilt in the BP murders *the trial court violated Davis's constitutional right to due process under the Florida and U.S. Constitutions.* A new trial is required.

(Emphasis added.) To the extent that Davis argues that appellate counsel did not adequately argue a federal constitutional violation, this Court was on notice on direct appeal that Davis alleged that the trial court violated his federal constitutional rights, and we addressed Davis's claim as follows:

> In the sentencing order, the trial court referred to the fact that at the time that Davis attempted to rob the BP and murdered Dashrath and Pravinkumar, Davis was a convicted felon and on felony probation. In July 2007, several months before the BP crimes, Davis was convicted of felony grand theft and sentenced to probation. Based on this evidence, Davis was convicted of possession of a firearm by a convicted felon. Davis, though, argues that the trial court also considered the felony convictions as proof of his guilt for the murder,

attempted murder, and attempted robbery charges. In the sentencing order, the trial court said the following:

> The circumstantial and non-circumstantial evidence concerning the Headley Insurance Agency crimes proves, beyond a reasonable doubt, that Leon Davis, Jr. robbed the Headley Insurance Agency and killed Yvonne Bustamonte [sic] and Juanita "Jane" Luciano as was found by the Jury in that case. The gun used in those crimes was also used to murder Pravinkumar C. Patel and Dashrath Patel. Beyond the fact that the Defendant purchased a Dan Wesson .357 revolver from Randy Black and all six projectiles recovered from the two crime scenes are consistent with having been shot from the same type of firearm, there are numerous other circumstantial facts that lead to the conclusion, beyond a reasonable doubt, that Leon Davis, Jr. committed the BP murders.

> Leon Davis, Jr. was facing some very serious financial setbacks. He did not have a job, and his wife was on leave from her employment due to a problem pregnancy. His credit cards were maxed out, and he only had a few dollars in his accounts at Mid Florida Federal Credit Union. He was behind on his mortgage payments, and he owed money on a loan to the bank. He had even given up his cell phone. Due to an inability to pay his insurance payments, he parked his Nissan Maxima and was using his wife's car. He was also facing his son's . . . upcoming birthday and the Christmas holidays.

> In spite of his financial difficulties, Mr. Davis decided to purchase a gun and spent $220.00 on a Dan Wesson .357 revolver. *This is a very strange purchase, and an unlawful act, in light of the fact that the Defendant was a*

> *convicted felon on felony probation at the time
> of his acquisition of the firearm.*
>
> (Emphasis added.) Davis argues that this language proves that the trial court considered his felony convictions as proof of his guilt on all of the charged offenses. Davis's argument is without merit.
>
> The language emphasized by Davis must be read in context. The trial court did not conclude that Davis committed the BP crimes because he was a convicted felon. Rather, the trial court focused on Davis's purchase of the revolver before the BP crimes. The fact that Davis purchased a .357 magnum revolver on the same day of the BP crimes is circumstantial evidence of his guilt. Davis is not entitled to relief on this issue.

*Davis*, 207 So. 3d at 194-95.

Thus, Davis's claim of a constitutional violation, federal or state, is without merit because no constitutional violation was implicated by the trial court's comments. Davis cannot demonstrate prejudice because as this Court concluded on direct appeal, the trial court did not consider Davis's prior convictions as proof of his guilt. The trial court was focused on the purchase of the Dan Wesson .357 magnum revolver and only referred to Davis's convictions in that context.

Davis's claim that appellate counsel's performance violated the suspension clause of the United States Constitution is also without merit. We therefore deny Davis's habeas claim.

# CONCLUSION

For these reasons, we affirm the circuit court's denial of postconviction relief and deny Davis's petition for habeas relief.

It is so ordered.

MUÑIZ, C.J., and CANADY, LABARGA, COURIEL, GROSSHANS, and FRANCIS, JJ., concur.
SASSO, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Polk County,
  Donald G. Jacobsen, Judge
  Case No. 532007CF00961301XXXX
And an Original Proceeding – Habeas Corpus

Robert Friedman, Capital Collateral Regional Counsel, Tallahassee, Florida, and Stacy R. Biggart, Special Assistant – Capital Collateral Regional Counsel, Northern Region, Gainesville, Florida,

    for Appellant/Petitioner

Ashley Moody, Attorney General, Tallahassee, Florida, and Marilyn Muir Beccue, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee/Respondent